**ELLICOTT MACHINE CORPORATION**

v.

**The UNITED STATES and AMERICAN MARINE AND MACHINERY COMPANY, INC., Third-Party Defendant.**

**No. 196–66.**

United States Court of Claims.

Jan. 24, 1969.

Donald W. Farrington, Cleveland, Ohio, for plaintiff, William T. Estabrook, Washington, D. C., attorney of record, Charles B. Gordon, Cleveland, Ohio, of counsel.

Joseph A. Hill, Arlington, Va., with whom was Asst. Atty. Gen., Edwin L.

Weisl, Jr., for defendant, Earl G. Thomas, Alexandria, Va., of counsel.

Stephen D. Potts, Washington, D. C., attorney of record for third-party defendant, Shaw, Pittman, Potts, Trowbridge & Madden, Washington, D. C., and Harrington A. Lackey, Nashville, Tenn., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner James F. Davis with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed March 11, 1968. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the opinion, findings and recommended conclusion of law of the trial commissioner (with one slight modification in the findings), as hereinafter set forth, it hereby adopts the same (as modified) as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

DAVIS, Commissioner:

This is a patent suit under 28 U.S.C. § 1498 to recover "reasonable and entire compensation" for the Government's allegedly unauthorized use of plaintiff's patented invention. Plaintiff is sole owner of the patent in suit. The device alleged to infringe was made for defendant by American Marine and Machinery Company, Inc. (hereinafter "AMMCO") under an indemnity agreement. On defendant's motion, AMMCO entered the case as third-party defendant.

The principal issue before the court is whether the invention defined in the single claim of the patent in suit meets the requirement for patentability set out in 35 U.S.C. § 103, i. e., was unobvious to one of ordinary skill in the art at the time the invention was made. There is no serious contention that the patent is not infringed, if valid.[1]

■■  Resolving the issue of patent validity under 35 U.S.C. § 103 requires factual analysis of (1) the scope and content of the prior art, (2) the differences between the prior art and the claim at issue, and (3) the level of ordinary skill in the pertinent art. Against this background and also in view of such considerations as commercial success, long-felt need, failure of others, etc., obviousness or unobviousness of the invention is to be determined. Graham v. John Deere, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Martin-Marietta Corp. v. United States, 373 F.2d 972, 179 Ct.Cl. 70 (1967).

### Background and prior art

The patent in suit relates to dredges. A dredge is a machine for removing soil, rock and other solid materials (called spoil) from the bottom of channels, rivers and the like. Dredges generally

---

[1] Pro forma, infringement is denied. However, defendant requests no findings of noninfringement; and the only statement about infringement in its brief is thus: "Since the patent in suit is clearly invalid, there is no necessity to consider the question of infringement as there can be no infringement of an invalid patent." Likewise, third-party defendant's brief states, "Plaintiff's claim of infringement cannot be upheld because the patent in suit is invalid * * *. Infringement is not conceded; there simply is no reason to discuss it because of the patent's invalidity for want of non-obviousness." Third-party defendant also states the accused device is not an "exact copy" of the patented device.

Considerable evidence was put in at trial on the issue of infringement, much of which is based on undisputed drawings and photographs. As later noted, the patent claim as herein construed reads on the accused device.

are classified in the art as hydraulic-type and bucket-type.

Hydraulic dredges, also called suction or pump dredges,[2] excavate by sucking up solids and water into a suction pipe with a centrifugal pump, then discharging the solids-water mixture into basins or spoil banks. The suction pipe is carried by a boom-like ladder on the end of which is mounted a rotary cutter which dislodges and breaks up solids.

Bucket dredges remove material by means of buckets which bite or dig into the bottom and scoop up solids for dumping into scows or upon spoil banks. One type of bucket dredge is a dipper dredge. It resembles a conventional steam shovel and has a single bucket attached to the end of a boom.

Dredges, in general, comprise four elements: (1) a hull which supports the working equipment of the dredge; (2) a ladder, boom or support arm which carries a bucket or a cutter for performing excavation; (3) spuds, or legs, supported for vertical movement on the hull, which, during operation of the dredge, are embedded in the river or channel bottom to maintain the hull level and prevent its lateral movement; and (4) a prime power source (e. g., a steam or diesel engine) which runs auxiliary power and control equipment for operating ladders, cutters, spuds, etc.

The prior art shows that at the time the invention in suit was made, suction dredges were known which comprised a hull, a ladder mounted thereon, a rotary cutter mounted on the end of the ladder, and spuds for holding the dredge in position during operation. The ladder was mounted on the hull in one of two ways: either for pivotal movement in the vertical direction only (in which case the dredge was called a "swinging dredge") or for pivotal movement both horizontally and vertically (called a "swinging ladder dredge").

Swinging ladder dredges were particularly useful in narrow channels where it was desirable to dredge a path no wider than the dredge hull. They generally had three spuds two forward and one aft. The forward spuds could be raised under power, usually by windlass and cable, but were lowered by gravity. Swinging dredges, on the other hand, generally had only stern spuds, thereby leaving the front of the hull free to swing.

The power plant for suction dredges was usually a steam or diesel engine, and the auxiliary equipment, i. e., the ladder, spuds and cutter, was run electrically, hydraulically, by steam, or combinations thereof. The choice of power plant and auxiliary power and control equipment depended in large measure on economics, rather than engineering, and upon conditions under which the dredge was to be operated, e. g., climate, experience of personnel, size and condition of channel or river bed to be dredged, etc.

Suction dredges were operated by swinging the ladder and rotary cutter back and forth across a channel or river bottom. In the case of swinging dredges, the hull and ladder moved together as a unit; in swinging ladder dredges, the ladder swung independently of the hull. Solids were cut and dislodged by the cutter and sucked up into a suction pipe carried by the ladder. Generally, the ladder was lowered under gravity and the downward force exerted by the cutter on solid bottoms was therefore limited by the weight of the ladder. However, even before 1900, those skilled in the art recognized that it was desirable under some circumstances to increase the downward force on the cutter to ensure a good bite into hard bottoms. Accordingly, ladders of swinging dredges were sometimes loaded or slugged with concrete blocks or steel punchings to increase their weight and thereby apply

2. The terms "hydraulic" and "hydraulic pump" are later used in this case in another sense. Therefore, to avoid confusion, "hydraulic" and "pump" will not hereafter be used synonymously with "suction."

greater downward force on the cutter. There is no prior-art teaching that swinging ladder dredges were ever similarly loaded.

At the time the invention in suit was made, there were also, known dipper dredges which comprised a hull, a boom for carrying a bucket, and three spuds, two of which were at the bow on each side of the hull, the other at the stern. The spuds of dipper dredges, unlike the spuds of suction dredges, were generally powered both up and down, i. e., they were not only raised under power but were also forced down under power, rather than merely dropped by gravity. The mechanism for moving the spuds was usually a cable-and-drum assembly, operated electrically or by steam. The so-called "forced down" spuds were desirable in dipper dredges for two reasons: (1) When large quantities of solids were picked up in the bucket and pivoted about the front of the hull, the center of gravity of the ladder-hull system shifted, which tended to dislodge the spuds, unsecure the hull, and disturb the hull level; and (2) the resistance of the solid bottom to the cutting force of the bucket tended to dislodge the spuds. In either event, the hull could be resecured and releveled by forcing appropriate spuds either up or down. Generally, the two forward spuds were designed to move up or down together and often were operated by a common prime mover. However, on some dipper dredges, the spuds could be moved independently.

*Patent in suit*

The dredge described and claimed in the patent in suit is a suction dredge. The patent specification states the invention relates "particularly to a hydraulic control system for a dredge with a ladder that may be moved laterally as well as vertically." One object of the invention was to provide a dredge hydraulic power and control system which eliminates complicated rigging, common on older dredges. The specification states, "Since all of the rigging and super structure necessary in prior dredges has been eliminated the applicant has been able to provide a compact easily operated dredge which is particularly well adapted for use in dredging in confined places such as irrigation ditches and small canals."

Plaintiff's dredge (illustrated and described in detail in finding 8) is similar to prior art suction dredges and comprises in essence a hull, a ladder pivoted for moving vertically and horizontally at the end of the hull, a rotary cutter mounted at the outer end of the ladder, two forward spuds and one stern spud, and a diesel engine to run a hydraulic pump which, in turn, operates (1) hydraulic cylinders for moving the ladder and spuds, and (2) a hydraulic motor for rotating the cutter.

In one embodiment of the invention, the forward spuds are linked to hydraulic cylinders by means of separate cable-and-drum mechanisms. Cables, attached to the upper and lower ends of the spuds, are looped around and anchored to the drums so that when the drums rotate, the cables are wound or unwound, and the spuds raised or lowered accordingly. The drums can be rotated independently thereby permitting the spuds to be raised and lowered separately.

The single claim of the patent is reproduced below in outline form (emphasis added):

A dredge comprising
  an elongated hull,
  a dredge ladder mounted at one end of the hull for pivotal swinging movement about horizontal and vertical axes,
  a rotating cutter mounted on the outer end of the dredge ladder,
  hydraulic motor means for rotating the cutter mounted on the dredge ladder,
  an engine and dredge pump unit mounted on the hull,
  a hydraulic pump driven by the engine operatively connected to said hydraulic motor means,

*a first hydraulic means* operatively connected to said hydraulic pump *to swing the ladder about its horizontal axis,*

a second hydraulic means operatively connected to said hydraulic pump to swing the ladder about its vertical axis,

spud guide means at said one end of the hull at each side of said ladder,

a spud mounted for vertical movement in each of said spud guide means, *mean to* raise and *pull down each of said spuds* comprising a cable drum rotatably supported on the hull adjacent the spud guide,

a first cable secured to the upper end of a spud at one side thereof and to said cable drum,

a second cable secured to the lower end of the spud at the same side thereof and to the cable drum,

hydraulic means operatively connected to said hydraulic pump to rotate the drum whereby the first cable is unwound from the drum as the second cable is wound onto the drum and the spud is driven down to oppose the reaction of the cutter with respect to the hull.

Plaintiff contends its dredge is novel in two respects: First, the ladder, on the end of which the rotary cutter is mounted, can be *forced down* under hydraulic pressure, rather than simply lowered by gravity, thereby increasing the "bite" of the cutter into solid material to be excavated; and second, the spuds can be *pushed down,* as well as raised, under hydraulic power and independently of one another, to prevent careening of the hull during dredging. The italicized portions of the claim, recited above, point out the novel features. The ladder is forced down by a "first hydraulic means" which the specification states is a "double-acting" hydraulic cylinder. The cylinder is arranged so that movement in one direction raises the ladder, and in the opposite direction lowers the ladder. The spuds are "pull[ed] down" as well as "raise[d]" by a cable-drum as-

sembly, above noted, which is similar to that used on prior art dipper dredges.

Plaintiff's dredge operates as follows: With the hull in dredging position, the spuds are lowered and forced down into the river or channel bed to secure the hull in position. Dredging is performed, similarly to prior art swinging ladder suction dredges, by swinging the ladder in lowered position back and forth across the bed with the cutter rotating. Solids mixed with water are sucked up into a suction pipe and discharged. Plaintiff contends its dredge is superior to prior art suction dredges in that the cutter can be forced into hard material, such as clay or tree roots, by pushing the ladder down or sideways under hydraulic power. Unbalanced forces created on the ladder-hull system by forced movement of the cutter against solids may tend to dislodge the spuds and unbalance the hull. E. g., the dredge may tend to "jackknife" when the cutter is pushed down. In such event, the spuds of plaintiff's dredge can be appropriately pushed down, as well as pulled up, under power to resecure and relevel the hull. The ladder, spuds and cutter are operated by one man who actuates hydraulic controls from a monitoring station on the hull deck.

The claim in suit admittedly defines a combination invention, and plaintiff does not contend that the individual elements comprising its combination are per se new. Plaintiff does, however, contend that its dredge, considered *as a whole,* is an unobvious and therefore patentable combination within the meaning of 35 U.S.C. § 103. Graham v. John Deere Co. (Calmar, Inc. v. Cook Chemical Co.) 383 U.S. 1, 86 S.Ct. 684, (1966); L & A Products, Inc. v. Britt Tech Corp., 365 F.2d 83 (8th Cir. 1966). In addition to the usual arguments of unobviousness in view of the prior art, plaintiff relies on commercial success, long-felt need, and failure of others.

Defendant's principal contention for invalidity is that plaintiff's dredge is nothing more than an obvious combination of known elements which co-act as

in the prior art and produce no unexpected result, to which plaintiff responds that defendant's position is based on reconstruction of the invention through hindsight by picking and choosing elements in the prior art without regard to considering the invention as a whole.

■ Before discussing the question of obviousness, there is a threshold issue of the scope and meaning of the claim. Defendant contends that the claim phrase "a first hydraulic means * * * to swing the ladder about its horizontal axis" does not specify a "forced down" ladder but rather a ladder which is lowered by gravity as in the prior art. Defendant's argument is without merit. The "first hydraulic means" recited and defined in the claim is an element of the patented combination. Title 35 U.S.C. § 112 expressly permits such an element to be claimed as "a means * * * for performing a specified function *without the recital of structure * * * in support thereof*, and such claim shall be construed to cover the *corresponding structure * * * described in the specification and equivalents thereof*." [Emphasis added.] The "first hydraulic means" of plaintiff's patented combination is a double-acting hydraulic cylinder which is arranged in plaintiff's combination to force the ladder up or down, and such structure is therefore implicitly recited in the claim. See Stearns v. Tinker & Rasor, 252 F.2d 589, (9th Cir. 1957).

■ Likewise, defendant argues that the phrase "means to raise and pull down each of said spuds" does not specify that the spuds are capable of being moved up and down independently of one another. For reasons above expressed, the argument is without merit since the corresponding structure recited in the specification, and therefore implicit in the claim, is inherently capable of such movement.

In essence and stripped of verbiage, the issue of patentability here comes down to whether it was obvious at the time the invention was made to use a "forced down" ladder and "forced down" spuds on a swinging ladder suction dredge. Plaintiff contends such use was not obvious because it was not suggested by the prior art and because the ladder and spuds, in conjunction with the other elements of its combination, function in a new and unobvious way. Specifically, plaintiff contends the ladder and spuds cooperate in a novel way to ensure efficient cutting while, at the same time, prevent careening of the hull.

■ Since hindsight is often difficult to avoid in determining obviousness of inventions, it is frequently helpful to inquire into the problem in the art to which the invention was directed as a guide to what those skilled in the art would have considered obvious. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 68, 43 S.Ct. 322, 67 L.Ed. 523 (1923); In re Conover, 304 F.2d 680, 49 CCPA 1205 (1962). Plaintiff says the problem in the art was to provide a compact, self-contained[3] dredge that would dig a relatively narrow channel, continuously remove spoil from the dredged area, and operate efficiently without careening in inundated swamp areas. Inherent in such problem was the unpredictable nature of swamp or channel bottoms which might be soft or hard and contain rocks, tree stumps, and the like. A cutter was therefore required which could be easily maneuvered to cut effectively, and means were required to keep the dredge level and stable while maneuvering the cutter.

Plaintiff's dredge apparently met these criteria. However, it does not necessarily follow that the means employed in the solution were unobvious within the meaning of the patent law. In re Gonser, 327 F.2d 500, 51 CCPA 1026 (CCPA 1964). Review of the prior art is persuasive that the patentee did nothing unobvious. Self-contained dredges

3. A self-contained dredge is one in which all dredging equipment and personnel are located on the dredge hull. In some prior art dredges, it was common to have auxiliary equipment and personnel stationed on the channel or river bank to assist in dredging operations.

were old when the invention in suit was made. So also was it old to use hydraulic power to operate and control auxiliary equipment on dredges. Although no single dredge in the prior art used hydraulic power and control exclusively, ladders and cutters were operated hydraulically on suction dredges as early as 1887; and by the time the invention in suit was made, it was well within the skill of the art to use hydraulics for all suction dredge auxiliary power and control requirements. This is not to say that calculating the proper size and dimensions of hydraulic equipment was a simple matter. However, the record shows that modern hydraulic equipment was available at the time the invention was made and that such calculations were within the skill of the ordinary dredge engineer.

In addition, at the time the invention was made, swinging ladder suction dredges were old, and had been used in the art for precisely the reason asserted by plaintiff, viz., to permit dredging in narrow channels and other confined places. So also was it old, even prior to 1900, to load ladders of swinging dredges to force down the ladder to improve the bite of the cutter. Plaintiff simply applied this well-known technique to a swinging ladder dredge to accomplish substantially the same result in substantially the same way. The fact that plaintiff's ladder was forced down under hydraulic power rather than by crude weights simply reflects advances in technology of hydraulic power at the time the invention was made.

Plaintiff correctly points out that with hydraulic power, the ladder can be forced down under greater force than by weights alone. However, since at the time the invention was made hydraulic power was an obvious substitute for weights to put down pressure on the cutter, such advantage renders the use of hydraulic power no less unobvious. The hull-ladder unbalance problem created by a "forced down" swinging ladder was no different in principle than the similar problem in dipper dredges, noted above, i. e., the forced movement of the bucket,

up, down and sideways, against solids, created the same kind of unbalance problems as the forced movement of a cutter head. The existence of the unbalance problem would have been apparent to any dredge engineer of ordinary skill and its solution was obvious in view of the dipper dredge art where "forced down" spuds had long been used in substantially the same way to provide substantially the same result.

■■ In sum then, plaintiff's dredge is nothing more than an obvious combination of well-known mechanical features brought together in an obvious manner to function as a combination as one skilled in the art would expect. Such combinations are not patentable under 35 U.S.C. § 103. In re Troiel, 274 F.2d 944 (CCPA 1960); II Walker, Patents § 110, at 199 (Deller's 2d ed. 1964).

Plaintiff contends its dredge was a commercial success, that it succeeded where others failed, and that it filled a long-felt need in the art, all of which may be "secondary considerations" of unobviousness. Graham, supra. While commercial success is conceded, it does not necessarily follow that it is an indicia of unobviousness. Because plaintiff's dredge used hydraulic power and control exclusively, it was small, compact, easily operated, and readily transported from place to place. Also, since modern hydraulic components were in large part readily available in the market, sometimes as catalog items, at the time the invention was made, plaintiff's dredge could be mass-produced relatively inexpensively. Commercial success appears to have been attributable in large measure to these considerations and not to any new, unexpected or unobvious performance characteristics of the dredge. See Palmer v. United States, 182 Ct.Cl. 896 (1968).

■ The only evidence of failure of others was testimony that, in one instance, plaintiff's dredge successfully replaced a land-based excavator in cutting a drainage canal through a swamp. There is no evidence, other than what

may be inferred from commercial success, that there was long-felt need over which others struggled and failed before the invention in suit was made. This is not a case, like *Eibel*, and *Conover*, supra, where recognition of a problem deserves great weight in deciding whether its solution was obvious. Plaintiff has shown no "persistent" problem, as in *Eibel* and *Conover*, which evaded solution by those in the art. Rather, the evidence, including the prior art, more clearly indicates that plaintiff's dredge evolved through the exercise of ordinary skill in the natural and expected development of the art, and while it may have solved a problem, it did so in an obvious way. It was never intended that patents be granted on such advancements. Hotchkiss v. Greenwood, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1850); In re Doran, 251 F.2d 848, 45 CCPA 787 (1958). Therefore, the quantum of evidence on "secondary considerations" is not sufficient in this case to "tip the scales of patentability." Calmar, Inc. v. Cook Chemical Co., supra.

█ Plaintiff finally contends that the presumption of validity accorded all patents (35 U.S.C. § 282) is strengthened here because the Patent Office considered the most pertinent prior art. On the contrary, the Patent Office did not have before it the fact that it was well known to load ladders of swinging dredges to increase the effectiveness of the cutter. This point came up for the first time at the trial through defendant's expert witness, and is not disputed by plaintiff. For reasons above discussed, it is crucial evidence in deciding obviousness. Also, the Patent Office did not consider the Milkowski reference (finding 14) which expressly notes and describes the advantages of swinging ladder suction dredges for cutting narrow channels.[4] Accordingly, the presumption of validity is weakened and, in this case, overcome. *Martin-Marietta*, supra.[5]

Therefore, for reasons above discussed, the patent in suit is invalid under 35 U.S.C. § 103.

*Infringement*

█ As earlier noted, defendant does not seriously argue nonreadability of the claim on the accused dredge. In fact the evidence shows (finding 19) that defendant's dredge has every element recited in the claim and operates in substantially the same way to achieve substantially the same result. Infringement is therefore made out if the patent is valid.[6] Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 50 S.Ct. 9, 74 L.Ed. 147 (1929); Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

FINDINGS OF FACT

1. This is a patent suit under 28 U.S.C. § 1498. Plaintiff seeks reason-

4. Swinging ladder suction dredges considered by the Patent Office were old at least as early as 1887 and inherently possessed the advantages for use in narrow channels urged by plaintiff. However, Milkowski in 1934 taught a more modern swinging ladder suction dredge and expressly noted that the swinging ladder was chosen because of the requirements of working in a narrow channel. Therefore, to this extent, Milkowski is more pertinent prior art than was considered by the Patent Office.

5. It will serve no useful purpose to review in detail the Patent Office prosecution history of the patent in suit. Suffice it to say that the patent's sole claim was allowed only after extensive prosecution of the application which culminated in a final rejection. After an interview with the examiner, the claim in suit was presented and allowed. It is considerably narrower in scope than earlier-presented claims.

6. Defendant contends the claim erroneously states (last phrase) that "the spud is driven down to oppose the reaction of the cutter with respect to the hull," rather than "up." Defendant, however, does not urge in its findings that the claim is invalidated under 35 U.S.C. § 112 for that reason alone and is willing to construe the claim as reading "up" rather than "down" for purposes of analyzing the claimed invention vis-à-vis the prior art. Plaintiff apparently does not object; therefore, it will be so construed.

able and entire compensation for unauthorized use by defendant, the United States, of the invention described and claimed in U.S. Patent No. 2,850,814, entitled "Hydraulic Mechanism for Dredge," issued to plaintiff on September 9, 1958, on an application filed September 9, 1953, by C. E. Ellicott, Jr. Plaintiff's petition was filed in this court on June 15, 1966.

2. Plaintiff is a Maryland corporation with its principal place of business in Baltimore, Maryland, and is the sole owner of the patent in suit.

3. American Marine and Machinery Company, Inc. (hereinafter "AMMCO"), a Tennessee corporation having its place of business in Nashville, Tennessee, entered the case as third-party defendant in response to notice issued by the court on defendant's motion pursuant to Rule 23(g). AMMCO was represented by counsel at trial.

4. The issues before the court are (a) whether the invention defined in the single claim of the patent in suit meets the requirement for patentability set out in 35 U.S.C. § 103, i. e., was unobvious to one of ordinary skill in the art at the time the invention was made; and (b) whether the patent claim reads directly or under the doctrine of equivalents on the accused device. The parties have agreed to defer trial on the accounting issue, if any, until a ruling by the court on the issues of patent validity and infringement.

5. The parties have stipulated that (a) AMMCO manufactured a dredge for defendant under contract DA–22–052–CIVENG–65–509, awarded June 18, 1965 pursuant to defendant's invitation for bids, (b) defendant's Army Corps of Engineers has used such dredge since late December 1965 at the Enid Reservoir near Memphis, Tennessee, (c) plaintiff, in February 1966, charged defendant with infringement of the patent in suit by defendant's use of such dredge, and (d) defendant, in April 1966, denied infringement and validity of the patent.

6. The patent in suit relates to dredges. A dredge is a machine for removing soil, rock and other solid materials (called spoil) from the bottom of channels, rivers and the like. Dredges generally are classified in the art as bucket-type and hydraulic-type. Bucket dredges remove material by means of buckets which bite or dig into the bottom and scoop up solids for dumping into scows or upon spoil banks. Bucket dredges are further subclassified as grapple, dipper or ladder types. Grapple and dipper dredges have a single bucket attached to the end of a handle or boom. Ladder dredges consist of a series of small buckets which travel on endless chains around an inclined frame called a ladder. Solid materials are scooped up from the bottom by the buckets and are discharged as the buckets move over the top of the ladder.

Hydraulic dredges, also called suction or pump dredges, excavate by sucking up solids and water into a suction pipe by means of a centrifugal pump, then discharging the solids-and-water mixture into basins or spoil banks from which the water runs off and leaves a deposit of solids. Generally the suction pipe is carried by a boom-like ladder on the end of which is mounted a rotary cutter which dislodges and breaks up solid bottoms.

7. (a) Dredges, in general, comprise four elements: (i) a hull which supports the working equipment of the dredge; (ii) a ladder, boom or support arm which carries buckets or a cutter for performing excavation; (iii) spuds, or legs, supported for vertical movement on the hull, which, during operation of the dredge, are embedded in the river or channel bottom to maintain the hull level and prevent its lateral movement; and (iv) a prim power source (e. g., a steam or diesel engine) which runs auxiliary power and control equipment for operating ladders, cutters, spuds, etc.

(b) The prior art in evidence in this case (described fully in findings 10 to 17) shows that at the time the invention in suit was made, suction or pump dredges were known which comprised a hull, a ladder mounted thereon, a rotary cutter

mounted on the end of the ladder, and three spuds, two forward and one aft, for holding the dredge in position during operation. The ladder was mounted on the hull in one of two ways: either for pivotal movement in the vertical direction only (called a "swinging dredge") or for pivotal movement both horizontally and vertically (called a "swinging ladder dredge"). The forward spuds could be raised under power, usually by windlass and cable, but were lowered by gravity. The power plant for the dredge was generally a steam or diesel engine, and the auxiliary equipment was run electrically, hydraulically, by steam, or combinations thereof.

Suction dredges are operated by swinging the ladder and rotary cutter back and forth across a channel or river bottom. In the case of swinging dredges, the hull and ladder move together as a unit; in swinging ladder dredges, the ladder swings independently of the hull. Solids are cut and dislodged by the cutter and sucked up into a suction pipe carried by the ladder. When the ladder swings in the same direction as the underside of the rotating cutter is moving, the teeth of the cutter tend to bite into the solids and, generally, the weight of the ladder applied downward on the cutter is sufficient to ensure a good bite into the bottom. However, when the ladder swings opposite to the direction of movement of the underside of the rotating cutter, the cutter tends to override the bottom, particularly if it is hard material. To prevent such override, ladders of swinging dredges were sometimes loaded or slugged with concrete blocks or steel punchings to increase their weight and thereby apply greater downward force on the cutter. (Finding 17.) There is no prior-art teaching that swinging ladder dredges were ever similarly loaded.

(c) At the time the invention in suit was made, there were also known dipper dredges which comprised a hull, a boom for carrying a bucket, and three spuds, two of which were at the bow on each side of the hull, the other at the stern. The spuds of dipper dredges, unlike the spuds of suction dredges, were generally powered both up and down, i. e., they were not only raised under power but were also forced down under power, rather than merely dropped by gravity. The so-called "forced down" spuds were desirable in dipper dredges for two reasons: (i) When large quantities of solids were picked up in the bucket and pivoted about the front of the hull, the center of gravity of the ladder-hull system shifted, which tended to dislodge the spuds, unsecure the hull, and disturb the hull level; and (ii) the resistance of the solid bottom to the cutting force of the bucket tended to dislodge the spuds. In either event, the hull could be resecured and releveled by forcing appropriate spuds either up or down. Generally, the two forward spuds were arranged to move up or down together and often were operated by a common prime mover. However, on some dipper dredges, the spuds could be moved independently, although on no prior art dipper dredge could one spud be moved up while the other was moved down.

8. (a) The dredge described and claimed in the patent in suit is a suction or pump dredge. The patent specification states the invention relates "particularly to a hydraulic control system for a dredge with a ladder that may be moved laterally as well as vertically." One object of the invention was to provide a dredge hydraulic power and control system which eliminates complicated rigging, common on older dredges. The specification states, "Since all of the rigging and super structure necessary in prior dredges has been eliminated the applicant has been able to provide a compact easily operated dredge which is particularly well adapted for use in

dredging in confined places such as irrigation ditches and small canals."

(b) The dredge, as illustrated in patent Figs. 1 and 2, reproduced herein,

*Fig. 1*

PATENT IN SUIT

*Fig. 2*

PATENT IN SUIT

comprises essentially a hull 10, a ladder 11 pivotally attached to the hull at pivot points 12 and 13 to move both vertically and horizontally, a rotary cutter 44, forward spuds 14 and 16, a "walking" spud 19 mounted on the stern of the hull, a centrifugal suction pump 26 for drawing solids-water mixture up through suction pipe 49, and a discharge pipe 72 for dis-charging the solids-water mixture. The dredge power plant is a diesel engine 24 which operates suction pump 26 and hy-draulic pump 28.

(c) Rotary cutter 44, spuds 14, 16, and 19, and ladder 11 are all moved through mechanical linkages by hydrau-lic motors or cylinders which, in turn,

are controlled by hydraulic pump 28. Cutter 44 may be rotated clockwise or counterclockwise by hydraulic motor 46; spuds 14 and 16 move up or down by actuation of hydraulic cylinders 51 and 52; spud 19 moves vertically and horizontally by actuation of hydraulic cylinders 63 and 69; and ladder 11 moves horizontally by actuation of hydraulic cylinders 32 and 33, vertically by actuation of hydraulic cylinder 41. Hydraulic cylinders 41, 51, 52, 63 and 69 are "double acting," i. e., they can be forced to move forward or backward.

In one embodiment of the invention illustrated in patent Fig. 3, reproduced

Fig. 3

PATENT IN SUIT

herein, spuds 14 and 16 are linked to hydraulic cylinders 51 and 52, respectively, by means of separate cable-and-drum mechanisms. Considering spud 14, shown in Fig. 3, drum 65 is mounted on hull 10. Gear 56, on a common shaft with drum 65, rotates when rack 53 is moved horizontally by hydraulic cylinder 51. Cable 60 is attached to the upper and lower ends of spud 14 and is looped around and anchored to drum 65. When drum 65 rotates, cable 60 is wound or unwound and spud 14 is thus raised or lowered, depending on the direction of rotation.

(d) Plaintiff's dredge operates as follows: With spuds 14 and 16 raised and spud 19 lowered, the hull is moved into position for dredging by "kicking" spud 19 to move the hull forward or backward. Spuds 14 and 16 are then lowered and forced down into the river or channel bed to secure the hull in position. Dredging is performed by swinging the ladder in lowered position back and forth across the bed with the cutter rotating. Solids mixed with water are sucked up into suction pipe 49 and discharged out pipe 72. The cutter can be forced into hard material, such as clay or tree roots, by

pushing the ladder down with hydraulic cylinder 41 and sideways with hydraulic cylinders 32 and 33. The unbalanced forces created thereby on the ladder-hull system may tend to dislodge spuds 14 and 16 and unbalance hull 10. In such event, the spuds can be raised or lowered under power to resecure and relevel the hull. The ladder, spuds and cutter are operated by one man who actuates appropriate hydraulic controls from a monitoring station on the hull deck.

(e) Plaintiff contends its dredge is novel in two respects: First, hydraulic cylinder 41, which raises and lowers ladder 11, can force the ladder down as well as raise it up, thus permitting downward pressure to be exerted on cutter 44; and second, spuds 14 and 16 can be forced down (rather than simply dropped under gravity) as well as raised, thus to permit easy resetting of the spuds and leveling and adjustment of the hull.

9. The sole claim of the patent in suit is set out on page 1388.

10. (a) Defendant introduced into evidence five prior art patents which are listed below:

| Patentee and country | No. | Date issued | Considered by Patent Office |
|---|---|---|---|
| Bowers (U. S.) | 484,763 | Oct. 18, 1892 | Yes. |
| Carkin (U. S.) | 428,163 | May 20, 1890 | No. |
| Lobnitz (Brit.) | 318,807 | Sept. 12, 1929 | No. |
| Milliken (U. S.) | 358,686 | Mar. 1, 1887 | Yes. |
| Neveling (U. S.) | 1,915,331 | June 27, 1933 | Yes. |

(b) Also in evidence as prior art are part or all of each of the following publications:

F. SIMON, DREDGE ENGINEERING, published 1920;

C. PRELINI, DREDGES and DREDGING, published 1911;

V. MILKOWSKI, Bullwheel-Mounted Cutter on Hydraulic Dredge, Engineering News-Record, Aug. 23, 1934;

Trade Brochure of Ellicott Machine Corp. (1950), entitled "Introducing the Ellicott Little Dragon Hydraulic Dredge."

11. Bowers teaches a suction or pump dredge comprising an elongated hull, a ladder pivotally mounted at one end of the hull for swinging both horizontally and vertically, a rotary cutter at the outer end of the ladder, a hydraulic motor for rotating the cutter, an engine and pump mounted on the hull, a hydraulic pump driven by the engine and connected to the hydraulic motor, and a hydraulic cylinder for hoisting the ladder vertically. The ladder is swung horizontally by means of windlasses and cables. The patent does not expressly state how the windlasses are powered, but the prime power plant for the dredge is a steam engine.

The Bowers dredge is supported and stabilized against lateral movement by two forward spuds and one rear spud which serve as "anchors for holding the hull in a stationary position when cutting a narrow channel." The spuds are dropped into position under gravity. They are raised by means of a windlass-and-cable mechanism.

12. Milliken, like Bowers, teaches a suction or pump dredge having basically a hull, a swinging ladder for horizontal and vertical movement, and a rotary cutter. In Milliken, however, unlike Bowers, the ladder is swung horizontally, as well as hoisted vertically, by means of hydraulic power, which acts through cables and "suitable winding machinery" to swing the ladder.

13. Lobnitz and Neveling relate to dipper dredges. Defendant relies on both patents for their teaching of drum-and-cable mechanisms for raising and lowering spuds. Carkin teaches a drum-and-chain device for actuating spuds on dredges.

On both the Lobnitz and Neveling dredges, two spuds are mounted at the front of the hull and a cable drum is mounted near each spud. Cables, wound on the cable drums, are run over sheaves near the top and bottom of the spuds and are attached at their ends to the spuds (Lobnitz) or the hull (Neveling). As the cable drums are rotated, the cables are wound or unwound and the spuds correspondingly raised or lowered. The drums normally rotate together so that the spuds are either raised or lowered simultaneously. However, in Lobnitz, the drums can be disengaged from one another, by means of a clutch, and rotated independently, although not in opposite directions at the same time. In Lobnitz, the drums are rotated by a steam engine; in Neveling, by an electric motor.

In Carkin, a chain, wound around a rotatable drum, runs over sheaves at the top and bottom of a spud and is secured at its ends to the hull. A spud is moved up or down by rotating the drum under power so that the chain is simultaneously wound and unwound on the drum as the spud moves up or down. After lowering and setting the spuds into place, the chain is locked to prevent movement. Carkin states that the "hull * * * on which is located the dredging-machine and operating engine, is not shown in full, as such construction is so well understood it is thought to be unnecessary to illustrate it." Carkin does not state whether the dredge is a dipper dredge or suction dredge. The spud-driving mechanism is separate for the spud and therefore if there were more than one spud each would be independently operable.

14. Milkowski teaches a suction dredge "designed to work in a narrow channel between high banks." The dredge was built in 1934 to enlarge the Grand Canal, Mexico City. The reference states, "On account of the small width of the canal, it was impossible to use a hydraulic dredge of the usual design. * * * To meet the various requirements and conditions of this job, a special type of dredge was designed * *. A novel feature of this design is that the ladder is arranged to swing independently of the hull, while the dredge is held stationary in the cut by means of three spuds."

The dredge comprises basically a hull, a pivoted ladder movable both horizontally and vertically, a rotary cutter on the end of the ladder, two forward spuds and a rear "walking" spud. The dredge is powered by a diesel engine which drives a suction pump and an electric generator. The ladder and spuds are moved by electrically powered cable-and-drum devices. The forward spuds are lifted under power but are lowered by gravity. The "walking" spud is used both for holding the stern of the dredge in position when excavating and for advancing the dredge forward in the cut. The dredge is advanced by raising the forward spuds and by "kicking" (pushing or pulling) the "walking" spud with a hydraulic cylinder.

15. Simon and Prelini, both of which are textbooks relating to the dredging art, teach fundamentals of dredging and dredge design. Only portions of each book were offered into evidence by defendant. Simon teaches definitions and classification of dredges (finding 6) as well as principles of design and construction of suction dredges. Prelini teaches fundamental principles of design and operation of both suction and dipper dredges, and describes in detail, among other things, dipper dredge spud construction and operation. In large part, the Simon and Prelini teachings are cumulative to prior art described in findings 11 to 14. A pertinent section of Prelini describes a mechanism for raising and lowering spuds on dipper dredges as follows:

* * * The raising and lowering of the spuds is done by means of steel wire ropes passing over sheaves and controlled by special engines. The

rope for lowering the spuds passes over a grooved sheave fixed at the top of the spud, and its free end is fastened to the forward side of the spud casting. The rope for raising the spud is also attached to the forward castings and passes around the sheave in a slot close to the foot of the spud. The other ends of the rope are attached to opposite ends of the drum of the spud engine. * * *

16. Plaintiff's trade brochure, entitled "Introducing the Ellicott Little Dragon Hydraulic Dredge," describes a diesel-powered suction dredge, manufactured by plaintiff before the invention in suit, in which the ladder swings only vertically. It is a so-called "swinging dredge." (Finding 7(b).) The ladder is moved horizontally by swinging the dredge hull and the ladder together. The only spuds are two stern spuds which are raised and lowered by wire ropes, or cables, wound around rotatable drums. The ladder is raised under power but is lowered under gravity and cannot be forced down under power.

17. In addition to the prior art noted in finding 10, the expert testimony at trial established as follows: At the time the invention in suit was made, those skilled in the art of dredge design and operation were aware that one could use steam, diesel and hydraulic power, and combinations thereof, to operate auxiliary equipment on a dredge, e. g., spuds, cable drums, ladders, etc. The choice of power plant depended in large measure on economics, rather than engineering, and upon the conditions under which the dredge was to be operated, e. g., climate, experience of personnel, size of river, channel or harbor to be dredged, etc. Hydraulic equipment was available, for the most part as standard items, which could readily be adapted to use on dredges. Calculation of power requirements for specific uses, within economic and engineering limitations, was within the skill of the dredge engineer.

Prior to 1900 it was known to load ladders of swinging dredges to increase their weight and push down the cutter head with greater force than provided by the weight of the ladder alone, thereby imparting to the cutter a better "bite" into solid bottoms. No serious hull unbalance problem was created by such loading since swinging dredges did not have forward spuds.

The hull unbalance problems created by forcing down under hydraulic pressure the swinging ladder of a swinging ladder dredge are similar to the hull unbalance problems created in dipper dredges by the reaction of the shovel to hard bottoms; i. e., in both cases, the hull tends to unbalance and career when the cutter or shovel is pushed or pulled against solids. While the extent and frequency of occurrence of unbalance may differ between the two dredges, the principle is the same.

18. Prior to filing its petition in this case, plaintiff made and sold 30 dredges of the type described in the patent in suit. One such dredge was successfully tested in a swampy area near Glen Burnie, Maryland, as part of the construction project for Friendship Airport near Baltimore, Maryland. Plaintiff's dredge replaced a land-based excavator on that project. There is no evidence that any other suction dredge, whether of the swinging ladder or swinging dredge type, had been used on such project.

There is no evidence that plaintiff granted licenses under the patent, that a license was ever requested, or that plaintiff ever brought suit on the patent prior to this suit.

19. Defendant's dredge, accused of infringement in this case, comprises the following elements: an elongated hull, a ladder mounted at one end of the hull pivoted for moving both horizontally and vertically, a rotating cutter mounted on the outer end of the ladder, a hydraulic motor mounted on the ladder for rotating the cutter, an engine and dredge pump unit mounted on the hull, a hydraulic pump driven by the engine and connected to the hydraulic motor, a pair of hydraulic cylinders connected to the hydraulic pump for moving the ladder vertically, a pair of hydraulic cylinders connected to the hydraulic pump for moving the ladder horizontally, spud guides on

each side of the forward end of the hull, a spud in each of the spud guides for movement up and down, a cable drum adjacent each spud and supported on the hull, a first cable attached to the upper end of each spud and to the drum, a second cable attached to the lower end of each spud and to the drum, and a hydraulic motor actuated by the hydraulic pump and connected to each cable drum for rotating each drum.

Defendant's dredge has all the elements recited in the claim in issue and operates in substantially the same way to produce substantially the same results.

### CONCLUSION OF LAW

Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.