Mrs. Winston **CALDWELL**, Administratrix, and James J. Shanley

v.

The **UNITED STATES**.

No. 326–70.

United States Court of Claims.

June 20, 1973.

French Caldwell, attorney of record, for plaintiffs. Paul T. O'Neil and Shanley & O'Neil, Washington, D.C., of counsel.

Michael W. Werth, Washington, D.C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiffs' exceptions to a recommended decision filed July 24, 1972, by former Trial Commissioner James F. Davis pursuant to Rule 134(h). The court has considered the case on the briefs and oral argument of counsel. Since the court agrees with the decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, plaintiffs are not entitled to recover and plaintiffs' petition is dismissed.

## OPINION OF COMMISSIONER

DAVIS, Commissioner:

This is a patent suit under 28 U.S.C. § 1498. Plaintiffs seek to recover "reasonable and entire compensation" for alleged unauthorized use by defendant, the United States, of inventions described and claimed in U.S. Patent Re 24,879 (the '879 patent or the patent in suit), entitled "Method and Apparatus for Converting Heat Directly Into Electricity." The '879 patent was granted to plaintiffs in 1960 on an application filed in 1958 and is a reissue of U.S. Patent 2,759,112 (the '112 patent) granted to the inventor, Winston Caldwell, in 1956 on an application filed in 1953. The '879 patent relates to thermionic converters which are devices for directly converting heat into electricity. There are 25 patent claims. Only claims 1, 2, 16, 17, and 21 are in issue. Claim 1 is a method claim while the others define apparatus. Plaintiffs contend that the claims in issue are infringed by thermionic converter devices supplied to agencies of the United States (NASA, AEC and the military services) by various manufacturers. The accused devices, most of which may be characterized as "cesium thermionic converters," are described in detail in findings 32–38.

▋ Defendant raises the usual issues of patent invalidity and noninfringement. Principal defenses are that the claims are invalid because they define inventions which are "anticipated" under 35 U.S.C. § 102 or "obvious" under 35 U.S.C. § 103, in view of prior art references, most of which were not considered by the Patent Office. Defendant also contends that the patent is invalid under 35 U.S.C. § 112 because it does not "disclose an operative embodiment to carry out * * * [the] invention."[1] Further, defendant says

that there is no infringement because the claims, properly construed, do not read on the accused devices; and, in any event, such devices were used by the United States only in "experimental" programs of thermionic converter development and were not used in any practical applications. For reasons discussed below, I hold that the patent claims, construed in light of the disclosure and the prior art, are invalid under 35 U.S.C. § 103. It is therefore unnecessary to consider other issues. Dow Chem. Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973 (1945); Decca Ltd. v. United States, 420 F.2d 1010, 190 Ct.Cl. 454 (1970), cert. denied, 400 U.S. 865, 91 S.Ct. 102, 27 L. Ed.2d 104; Smith v. United States, 145 F.Supp. 396, 136 Ct.Cl. 487 (1956).

### Background and patent in suit

Thermionic converters are electrical generators which operate on a principle of physics called thermionic emission. When some materials, particularly metals, are heated to high temperatures (e. g., above about 1000° C.), they emit electrons into the surrounding space. This is called thermionic emission. In simplest form, a thermionic converter consists of two closely-spaced electrodes, one called the emitter and the other the collector. The space between electrodes is on the order of 0.01–0.001 inches. The interelectrode space is either highly evacuated (hence a "vacuum thermionic converter") or is filled with cesium vapor at very low pressure, on the order of a few millimeters of mercury (hence a "cesium thermionic converter"). Normal atmospheric pressure is 760 millimeters of mercury. The emitter is heated to a high temperature (about 1000–2000° C.) so as to induce thermionic emission. The collector is maintained at a temperature lower than the emitter

---

1. Section 112. **Specification.**
 The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in

the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

(about 600° C.) and captures the emitted electrons, thus creating a potential difference (or voltage) between the emitter and collector. By connecting the collector and emitter through an external circuit, electrical current is made to flow.

Vacuum thermionic converters are inefficient and shortlived. That is to say, the amount of electrical energy generated in relation to heat energy put in is low, on the order of about 5 percent. Cesium thermionic converters are somewhat more efficient, on the order of about 15 percent. There are many reasons for the inefficiency and short life of vacuum thermionic converters, including inherent radiation heat losses from the high-temperature emitter, difficulties of cooling the collector, inefficiencies of electron transfer between emitter and collector, and problems associated with the deterioration of materials of construction. Also, the voltage generated by thermionic converters is limited, among other things, by the temperature difference between electrodes and the nature of the electrode materials. Generally, the voltage generated is on the order of magnitude of about one volt. The electrical current which can be produced varies considerably with the size, temperature and spacing of the electrodes and is on the order of 1 to 100 amperes per square centimeter of electrode surface area. Typical power ratings of experimental cesium converters procured by the Government were on the order of 50 watts.

Thus it can be seen that there are substantial theoretical and practical problems of making a thermionic converter which will produce quantities of electrical power of the magnitude necessary for useful operations. In fact, the record shows that the Government has spent $50 million on thermionic converter research and development and has yet to come up with a device which is useful for long-term practical generation of electricity. For the most part, the Government's research and development efforts have led only to the conclusion that much more work needs to be done.

Winston Caldwell, the inventor in suit, was an insurance executive and tobacco farmer who, in the late 1940's and early 1950's, did some experimental work on thermionic conversion. Caldwell had a technical education but had little practical experience in physics or electronics. His experiments were carried out in his home, with rudimentary equipment, generally consisting of conventional radio tubes and homemade paraphernalia. The gist of his experiments was to show that a radio tube could function as a thermionic converter by heating one element of the tube (the cathode) to a temperature sufficiently high to induce thermionic emission, in hopes of coming up with a practical thermionic converter. So far as the record shows, his experiments demonstrated nothing more than the principle of thermionic emission, known in the art at least as early as 1884.[2]

In 1953, Caldwell filed a patent application which matured into the '112 patent and, in turn, the reissue '879 patent in suit. Caldwell's application stated that his invention relates to an "electron tube designed to convert heat directly into electricity" and was adaptable "to generate and create a high voltage on commercially useful electric current." Among the objects of the invention were "to provide a device * * * which will act efficiently and economically to produce power"; "to provide apparatus * * * which is relatively simple and inexpensive in its construction and installation * * * and which when placed in use will operate efficiently and

2. In 1954, Caldwell wrote to the Stromberg-Carlson Company, in an attempt to interest it in his ideas on thermionic converters. Stromberg-Carlson replied that it was not interested in pursuing Caldwell's ideas and that "One of our engineers has pointed out that the principle involved [in Caldwell's work] is the well-known 'Edison effect'" described by Edison in 1884. The "Edison effect" demonstrated the principle of thermionic emission. (Finding 23.)

inexpensively substantially continuously or as desired, without interruption or requirement for repairs or services." Later, during prosecution of the application, Caldwell added as an object to provide "apparatus * * * to utilize large sources of what would otherwise be waste heat, such as heat obtained from solar energy or from the flue gases from power plants, atomic installations, or blast furnaces, or from the exhaust of jet engines and rocket missiles."

Though all of Caldwell's experimental work leading up to the patent application was performed with commercial radio tubes, the device disclosed in the patent specification is quite different. It comprises, in essence, two concentric cylinders spaced closely together (the specification says "perhaps something like 2/100 of an inch or less"). The space between the cylinders is "exhausted to a high vacuum," the purpose of which is "to prevent injury to the electron emitting coating covering the cathode" and "to create a condition of minimum heat loss from the cathode." The inner cylinder (cathode or emitter) is coated with a "material capable of emitting electrons" (such as thoriated tungsten) and, in one embodiment, is filled with "a large number of lengths of fine gauge refractory insulated wire" which Caldwell's drawings designate an "electron emissive substance." The cathode is to be heated by a burner or other heat source. The outer cylinder (plate or collector) is of unspecified material but is to be maintained, during operation, at a temperature below that of the emitter. Caldwell does not state how such lower temperature is to be maintained or what the temperature difference should be. The specification further states that a "commercially useful apparatus would be made with an overall diameter of 5 feet or more, and will be 10 feet to 20 feet tall * * *," and that the "voltage will be increased by increasing the size of the apparatus."

Caldwell never built a device as described in the patent specification; and the expert testimony at trial shows that

such a device, if built, would not operate as envisioned by Caldwell. (Findings 18 and 19.) In fact, the record establishes that Caldwell's device and concepts were impractical and were based on misconceptions or misunderstandings of the process of thermionic emission. *E. g.,* Caldwell thought that increasing the size of the device would increase the voltage output. Plaintiffs concede that this is wrong. Caldwell also thought that the "fine gauge refractory insulated wire" used to fill the cathode (or emitter) would increase electron flow from emitter to collector. This also is wrong, as established by expert testimony.

Pertinent, as corroborative of expert testimony at trial, is an exchange of letters in 1954 between Caldwell and W. G. Dow, Professor of Electrical Engineering, at the University of Michigan. Caldwell described his invention to Dow thus:

The tube I am trying to build is a model to demonstrate the fact that you can *increase the emission pressure of the electrons, or voltage, by increasing the size of the cathode and having free electrons within the cathode.* The idea of this construction would be to make an efficient type of thermo electric battery. For a commercial application the cathode would have to be constructed quite large, possibly a foot or more in diameter, and it would be heated by gas or some other source of heat.

You can readily see that the device would depend for its success on the emission of electrons from a heated surface coated with electron emitting material, which effect is quite well known. *It further depends for its effectiveness on having a large diameter cathode and having a large number of free electrons inside the cathode. This is the part which is new and is what I am trying to demonstrate.* [Emphasis supplied.]

Dow responded, in essence, that simply increasing the size of the cathode and the number of electrons inside the

cathode would have no effect on voltage or current. Further, Dow said:

> Therefore, all I can say, on the basis of a very considerable experience in the electron tube arts and in what is called "physical electronics" is that your plan is unsound in principle. I do *not* wish you to accept this because I say it; I merely suggest that my saying it makes it worthwhile for you to learn to understand the physics behind the situation a little better. Before you pursue the invention any further, I suggest that you study rather carefully chapters 7, 8, and 9 in my book mentioned above. ["Fundamentals of Engineering Electronics," published by John Wiley & Sons, in 1952.]

> I hope I may have been of some help to you. Under the circumstances, we would not, of course, want to try to build a model for you, for the reason that we are completely convinced beforehand that you would only experience a disappointment.

Caldwell's patent application, as filed in 1953, had seven claims, defining the invention in varying degrees of specificity but all directed to "an electron tube designed to convert heat directly into electricity." The application met with considerable resistance in the Patent Office. The examiner rejected all claims as "drawn to an apparatus which is apparently inoperative to carry out the objects of the invention." Further, the examiner solicited "affidavits as to tests on apparatus identified with that disclosed * * * setting forth test data from which the examiner may judge whether or not the device in question is operative, or by a demonstration of a working model before the examiner." As noted earlier, Caldwell had not built, nor did he ever build, a device as described and shown in the patent specification and drawings. Nevertheless, to meet the examiner's rejection, Caldwell built a model which comprised, in essence, a conventional 35Z5 radio tube with a cathode

and plate. He demonstrated to the examiner that when the cathode is heated to a high temperature, electrons flow from the cathode to the plate, a demonstration of nothing more than the principle of thermionic emission. The demonstration did not show that the apparatus described in the patent specification would operate as alleged to produce significant quantities of useful power. The examiner apparently was not impressed by the demonstration for he again rejected all claims on grounds of inoperativeness. (Finding 20.)

After some further correspondence between Caldwell's attorney and the patent examiner (including another interview), and after some minor modifications were made to the claims, the examiner (without explanation) withdrew the rejection on inoperativeness and allowed five claims. At no time were any claims rejected as unpatentable over prior art. The only prior art cited by the examiner was a patent to Hansell (finding 30) which the examiner characterized as being "of interest." In 1956, the application issued as the '112 patent.

In 1958, plaintiffs filed for a reissue of the '112 patent, a principal difference between the '112 patent and the newly filed application being the addition of claims which defined the invention as "a *device* for converting heat directly into electricity" rather than "an *electron tube* designed to convert heat directly into electricity." (Emphasis supplied.) Two new prior art references were cited by the examiner during prosecution of the reissue application, including a U.S. patent to Wick (finding 29), and the claims were rejected as unpatentable thereover. After further prosecution including an interview with the examiner, the reissue application was allowed with the five original patent claims and 20 new claims.[3]

*The invalidity defense*

 Section 112, 35 U.S.C., requires that patent specifications describe in-

---

3. Claims 1, 2, 16, and 17, here in issue, are new to the reissue patent. Claim 21 was claim 1 in the original patent.

ventions "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains * * * to make and use the same * * *." Implicit in that requirement is that the invention described be operable for the purpose disclosed. Beidler v. United States, 253 U.S. 447, 40 S.Ct. 564, 64 L.Ed. 1006 (1920); E. I. duPont de Nemours & Co. v. Union Carbide Corp., 250 F.Supp. 816 (N.D.Ill.1966); H. C. Baxter & Bro. v. Great Atlantic & Pacific Tea Co., 236 F.Supp. 601 (D. Me.1964), aff'd, 352 F.2d 87 (1st Cir. 1965), cert. denied, 384 U.S. 905, 86 S. Ct. 1338, 16 L.Ed.2d 358 (1966); 2 Walker, Patents §§ 92, 95 (Deller's 2d ed. 1964). While it is not necessary that the disclosure be of an ultimate commercial embodiment, it must at least be sufficient to teach those skilled in the art how to practice the invention without undue experimentation, especially where the invention is in an art involving sophisticated scientific principles. In re Perrigo, 48 F.2d 965, 18 CCPA 1323 (1931).

Defendant says that Caldwell's patent specification fails to disclose an "operable" invention because the device described therein has never been built and, if built, would not be practical and would not meet Caldwell's stated objectives. Accordingly, says defendant, Caldwell's disclosure does not support the patent claims. That argument is appealing in view of credible expert testimony that Caldwell's device would be "impractical" and would not produce electrical power as intended by Caldwell. It is appealing also because Caldwell's disclosure, construed in light of contemporaneous statements by Caldwell regarding the gist of his invention, is riddled with inaccuracies which raise the inference that he did not fully understand the principles of thermionic emission, nor the practical problems associated with building a workable device. However, on this record, it cannot be said as a matter of law that the Caldwell device is totally inoperative and useless. Defendant's expert conceded that a de-

vice built in accordance with Caldwell's teachings might "operate [as a vacuum thermionic converter] with efficiencies on the order of 1 percent." However, there is no doubt that the device could not be made to generate high voltages, nor could it be made to produce power economically and efficiently. Caldwell's patent claims must, therefore, be construed narrowly as defining a "paper" invention and not one which represents a basic or pioneer advance in the art. International Glass Co. v. United States, 408 F.2d 395, 187 Ct.Cl. 376 (1969).

In light of the above, we turn to analysis of the patent claims in view of the prior art. Claim 16 is representative (finding 17) and defines the invention in terms of the elements comprising Caldwell's device. In essence, the claim calls for a cathode (or emitter) having a surface of electron-emissive material, a plate (or collector) mounted in "closely spaced" relation to the emitter, a "vacuum" between the cathode and plate, means to heat the cathode, means to cool the plate, and electrical connections between the cathode and plate. For purposes here material, claims 2, 17 and 21 are substantially the same as claim 16. Claim 1 is to a method and, in essence, defines the steps of operating the device defined in claims 2, 16, 17 and 21. Defendant says the claims are invalid under 35 U.S.C. § 103 as defining an invention which would have been "obvious at the time the invention was made to a person having ordinary skill in the art," within the meaning of the statute. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

At trial, defendant introduced prior art not cited or considered by the Patent Office. As will be seen, the prior art is highly pertinent and overcomes the presumption of validity accorded patents under 35 U.S.C. § 282. Ellicott Mach. Corp. v. United States, 405 F.2d 1385, 186 Ct.Cl. 655 (1969); *International Glass Co., supra.* The prior art is described in detail in findings 22–31 and is here summarized to the extent pertinent. As earlier noted, Thomas Edison

demonstrated the principle of thermionic emission in 1884; and plaintiffs do not dispute that thermionic emission was well-known before Caldwell. Though Edison's work was not expressly directed to producing electric power by thermionic emission (finding 23), the fact remains that he taught that heated metal cathodes emit electrons porportionate to the temperature of the cathode, a teaching pivotal to the idea of generating electricity by thermionic emission and of great significance to later investigations. In 1915, Comstock disclosed a device for generating electricity by thermionic emission. (Finding 24.) Comstock recognized that thermionic emission was a mechanism for converting heat into electricity and his work was directed to that end. Comstock's thermionic generator comprised an emitter made of or coated with an electron-emissive material and heated to "red or white heat," and a collector cooled by a water jacket. The emitter and collector were not closely-spaced but rather were out of direct line of one another so as to minimize heating the collector by radiation from the emitter. Comstock's device was no doubt inefficient and impractical for generating any significant electric current, but it shows an early recognition in the art that thermionic converters must have an electron-emissive emitter, heated to red or white heat, a cooled collector and a vacuum chamber.

Also in 1915, Schlichter did experimental work on vacuum thermionic conversion. (Finding 25.) Schlichter's device was similar to Comstock's except that the electrodes were closely-spaced (about 0.20 inches). Schlichter further recognized that an emitter coated with metal oxide would increase electron emission. Schlichter summed up his work by noting that "thermionic cells are feasible" but operate "uneconomically" because of radiation heat losses.

In 1923, Langmuir did considerable work investigating the nature of thermionic currents, in an attempt to study the effects of electron "space charge" on thermionic emission. (Finding 27.)

"Space charge" is created by the presence of electrons around the emitter during thermionic emission. (Finding 8.) Langmuir found that "space charge" impedes the flow of electrons away from the emitter. Then in 1951, Champeix taught that thermionic converters must have, among other things, closely-spaced electrodes in order to minimize the adverse effects of "space charge." Champeix therefore postulated a vacuum thermionic converter with an oxide-coated emitter and a cooled collector, the emitter and collector being very closely-spaced. (Finding 28.)

In sum, by 1951 it was known in the art that thermionic conversion was a means of generating electrical current; that two electrodes were needed, a hot emitter (perhaps coated with an electron-emissive material) and a cool collector; that the electrodes should be closely-spaced; and that the space between electrodes should be evacuated. What remained to be done (and still remains to be done) to build an efficient and practical device, is intensive research on materials of construction, as well as further theoretical study on the mechanisms of thermionic emission and electron flow.

Plaintiffs make much of the fact that the prior art does not expressly teach electrode spacing of 0.02 inches or less, which is the spacing disclosed (but not claimed) by Caldwell. Schlichter, in 1915, taught electrode spacing of about 0.20 inches. Langmuir's work on "space charge" effects in 1923 suggests that electrodes must be closely-spaced in order to get significant current flow. Champeix, in 1951, recognizing the "space charge" problem, taught that the electrodes should be very closely-spaced. In view of such teachings, it seems obvious that one would desire to place the electrodes as close together as possible without actually touching. In any event, it appears that Caldwell's teaching of 0.02 inches electrode spacing is based on the fact that the 35Z5 radio tube, with which he did experimental work, had electrode spacing of 0.015 inches. In

early correspondence with his patent attorney, Caldwell suggested a spacing of 0.015 inches, but later (for unexplained reasons) changed to 0.02 inches. Caldwell's disclosure of electrode spacing therefore came from the prior art of radio tubes, and was not based upon any independent finding by Caldwell that such spacing was significant to thermionic conversion. Caldwell taught nothing more than was clearly suggested by the prior art.

In light of the prior art, Caldwell's patent claims cannot stand. The claims define nothing more than a combination of elements old and obvious to those skilled in the art at the time the invention was made, which combination functions substantially identically to the prior art to produce substantially the same result. Caldwell's disclosure added nothing to the art of thermionic conversion to help solve the baffling technological problems of building a practical thermionic converter. At best, Caldwell's disclosure was an invitation to experiment. The Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 221 (1895); Metals Recovery Co. v. Anaconda Copper Mining Co., 31 F.2d 100 (9th Cir. 1929); H. C. Baxter & Bro., *supra.*

Finally, plaintiffs would dismiss the prior art as not showing "one single workable thermionic converter." The short answer to this is that plaintiffs have not shown that Caldwell's device is any more "workable" than devices taught or suggested by the prior art. In fact, to date and despite extensive research efforts, no one has come up with a practical thermionic converter which meets Caldwell's objectives. If and when someone does, it will not be the result of any novel or unobvious teachings of Caldwell.[4]

4. The record shows that in the 1960's, progress was made in the art of thermionic conversion by, among other things, introducing cesium vapor into the interelectrode space, rather than maintaining the space a vacuum; and most of the Government's research efforts have been along the lines of cesium, rather than

**Application of George E. COMSTOCK and Thomas P. Gilmer, Jr.**

**Patent Appeal No. 8922.**

United States Court of Customs and Patent Appeals.

Aug. 2, 1973.

vacuum, thermionic converters. (Findings 32–38.) Caldwell does not teach, suggest or claim cesium thermionic converters; and while it is unnecessary to develop the point, there is considerable doubt whether cesium thermionic converters infringe the patent claims, even if valid.