**DECCA LIMITED**

v.

The **UNITED STATES.**

No. 274–64.

United States Court of Claims.

Jan. 23, 1970.

Robert B. Russell, Boston, Mass., Atty. of record, for plaintiff. Henry C. Nields, Douglas E. Whitney and Russell & Nields, Boston, Mass., of counsel.

Joseph A. Hill, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM.*

This is a patent suit under Title 28 U.S.C. § 1498, in which plaintiff seeks to recover reasonable and entire compensation for the alleged unauthorized use by or for the defendant of inventions in the field of electronic aids to navigation as set forth in U. S. Letters Patent Nos. 2,598,290, 2,582,350, 2,578,980, and 2,568,250. Plaintiff is the owner of record of said patents. The liability issue, including patent infringement and patent validity issues, is before the court, and any accounting issues are deferred until the question of liability has been determined. Plaintiff alleges that patent claims 15–19, inclusive, of the '290 patent, claim 3 of the '350 patent, claims 1, 2, 3, 6, and 7 of the '980 patent, and claim 1 of the '250 patent have been infringed by the defendant's use of "Loran-C" navigation systems and the manufacture of equipment for use in said systems.

This litigation involves electronic apparatus for use in navigation, apparatus of the type known as hyperbolic radio navigation systems. In the operation of such systems, separate transmitting stations fixed at known locations radiate radio signals which are sensed by a mobile receiver located at a position remote from the transmitters. The transmitting stations are synchronized to radiate radio frequency signals in a fixed time relationship. The mobile receiver picks up the signals and measures the time difference of the signals from the separate transmitting stations. Such signals are usually in the radio frequency range of about 60 to 100 kilocycles per second. By measuring the time difference between signals received from a first pair of transmitting stations, the mobile receiver is capable of determining a first hyperbolic line of position on which the receiver is located. A hyperbolic line is a curved line formed by a series of points each located at a constant difference in distance from two fixed points, i.e., from two fixed transmitting stations. The mobile receiver also measures the time difference between the signals received from a second pair of fixed transmitting stations and determines a second hyperbolic line of position. The intersection of the first and second lines of position pinpoints the current location of the mobile receiver relative to the several transmitting stations.

In one type of hyperbolic navigation system, the signals radiated from the transmitting stations are continuous wave signals, i.e., signals in the form of sine or regular waves having a fixed frequency. In such a system, the time difference is determined by measuring the difference in the phase of the continuous wave signals received from the separate transmitting stations. In another type of hyperbolic navigation system, the signals are radiated in the form of pulses or bursts spaced apart by fixed time intervals. In this second system, the mobile receiver measures the time difference between the arrival of the pulses or bursts from the separate

---

* This opinion incorporates, with very minor changes, the opinion prepared by then Trial Commissioner Donald E. Lane (now Judge of the United States Court of Customs and Patent Appeals), except with respect to claims 1, 2, and 3 of Patent 2,578,980, as to which we differ from him in reasoning and result.

transmitters. In both types of systems, time difference measurements are made to determine the current position of the mobile receiver in relation to the known locations of the transmitting stations. The continuous wave (CW) system measures the difference in phase, whereas the pulse system measures the time difference directly, in order to ascertain the position of the receiver.

### Patent 2,598,290

The '290 patent discloses an area identification system in which transmitting stations radiate modulated carrier signals. A radio frequency carrier signal is modulated by impressing another signal such as an audiofrequency signal on the carrier frequency signal to produce a regular alteration of the frequency or the amplitude of the frequency. Each of the carrier signals is modulated by the same modulation frequency, a signal in the form of a single sine wave. The mobile receiver performs two phase difference measurements. By measuring the difference in phase between the modulation components of the signals, the receiver provides a coarse indication of its location with respect to the fixed transmitting stations. By measuring the phase difference between the carrier components of the signals, the receiver provides a fine indication of its location. At trial, plaintiff relied upon claim 19 of the '290 patent. This patent claim reads as follows:

In a position determining system,

(a) spaced transmitters for radiating waves each comprising carrier and modulation components,

(b) means at a receiving point responsive to the modulation components of said waves for providing an indication which represents within a predetermined range the position of said receiving point relative to at least one of said transmitters, and

(c) means at said receiving point responsive to the carrier compo-

nents of said waves for providing a second indication accurately representative of the position of said receiving point within said predetermined range,

thereby accurately to define the position of said receiving point relative to said one transmitter.

The defenses asserted by the defendant include invalidity of the '290 patent under Title 35 U.S.C. § 103 in view of the prior art, invalidity of the '290 patent under Title 35 U.S.C. § 102(a) and § 102(g) as anticipated by low frequency Loran, invalidity of the '290 patent under Title 35 U.S.C. § 101, and noninfringement of the '290 patent by the Loran-C navigation system. It is concluded that the Loran-C system does not infringe claims 15–19 of the '290 patent. No conclusion is made regarding the other defenses raised by the defendant.

In determining the issue of patent infringement, it is well settled law that in the first instance resort must be made to the language of the patent claim. Graver Tank & Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The literal words of the patent claim constitute, however, only the starting point in the determination of this issue. The state of the prior art and the prosecution history of the patent application in the Patent Office are also important factors which must be considered in determining the meaning of a patent claim. Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Unless the patented invention is identical, in all respects, to the accused arrangement, the proper interpretation which is to be accorded to the language of the patent claim must be decided before the infringement issue can be resolved. Where a patented and accused device are not identical, it is necessary to consider the structure, operation, and result obtained by each device. Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935 (1877), sets forth the traditional principle of infringement: "if two devices do the same

work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." This principle is the basis for the doctrine of equivalents which is the standard for interpretation of language appearing in patent claims.

The doctrine of equivalents determines the scope of protection provided by patent claims which define the patent monopoly awarded to an inventor upon the issuance of his patent. This doctrine also establishes the limits on the protection available to a patent owner. Devices which are equivalents of the invention defined by a patent claim are encompassed within the claim. The claim cannot, however, be interpreted to encompass a device which is not the equivalent of the defined invention. The doctrine must be considered in every case in which the issue of patent infringement is involved. Literal infringement of a patent claim is not sufficient to establish liability for patent infringement. A device may be so far changed in principle from a patented device that it performs the same or similar function in a substantially different way, even though it falls within the literal words of the claim. In this case, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136 (1898).

Claim 19 of the '290 patent defines a position determining system as a combination of elements in which two of the elements are set forth as means for performing desired functions. There is no recitation of any specific structure for performing those functions. In this situation, the structure disclosed in the specification of the patent must be considered, and the patent claim will be construed to cover the disclosed structure and equivalents of that structure. Stearns v. Tinker & Rasor, 252 F.2d 589 (9th Cir. 1957).

The system disclosed in the '290 patent is a continuous wave system which employs a master transmitting station and two slave stations. The master station radiates a carrier frequency of 60 kilocycles per second (kc) which is modulated at an audiofrequency of 2,400 cycles per second (cps). The first slave station receives the modulated 60 kc signal from the master station and converts this signal to an 80 kc carrier frequency. The 80 kc carrier frequency is also modulated at an audiofrequency of 2,400 cps, and the modulated 80 kc signal is radiated from the first slave station. Similarly, the second slave station receives the modulated 60 kc signal and converts it to a 90 kc slave signal with an audiomodulation of 2,400 cps.

The mobile receiver employed in the system disclosed in the '290 patent receives the master and slave signals simultaneously. The receiver is provided with frequency converters for converting the 60 kc and 80 kc carrier frequencies to 240 kc signals and for converting the 60 kc and 90 kc carrier frequencies to 180 kc signals. The receiver performs a phase difference measurement on the 240 kc signals to provide an indication of the difference in phase between the 60 kc master signal and the 80 kc slave signal. It also measures the phase difference between the 180 kc signals to provide an indication of the difference in phase between the 60 kc master signal and the 90 kc slave signal. In addition, the receiver is designed to measure the phase differences betwen the 2,400 cps modulations impressed on the master and slave carrier frequencies.

In the operation of the system disclosed in the '290 patent, the carrier frequencies transmitted from the master station and the first slave station define a first set of hyperbolic lines of zero phase difference, i.e., lines along which the receiver senses no phase difference between the carrier frequencies. In the sector between two adjacent lines of zero phase difference, the phase relation of the carrier frequencies varies from zero degrees (0°) to 360°. The carrier fre-

quencies transmitted from the master and the second slave stations define a second set of hyperbolic lines of zero phase difference which intersect the lines of the first set.

The mobile receiver determines its position relative to the transmitting stations by identifying the intersections of the hyperbolic lines. A coarse determination of receiver position is made by measurement of the phase difference of the modulation components of the transmitted signals. This measurement on the modulation components determines the position of the receiver within a sector bounded by lines of zero phase difference which are established by the carrier frequency components. A fine determination of receiver position is made by measurement of the phase difference of the carrier components to accurately identify the position of the receiver within the sector. In order to achieve accurate position determination, the measurement performed by the receiver on the modulation components must provide an unambiguous identification of the sector within which the receiver is located. The fine position determination is made in relation to adjacent hyperbolic lines of zero phase difference. It only becomes meaningful when the hyperbolic lines defining the sector are uniquely identified. To facilitate unique identification of the hyperbolic lines, the transmitting stations are arranged so that the slave stations are spaced from the master station by distances equal to one wavelength of the modulation frequency. With this arrangement, the phase difference measurement of the modulation components permits the determination of a unique receiver position from which the hyperbolic lines bordering the sector of receiver position may be identified.

In construing the terminology of claim 19 of the '290 patent, it is noted that the patent specification discloses frequency converters and phase comparison circuitry in the receiver which cor-respond to the claim language "means at a receiving point responsive to the modulation components of said waves * * *." Furthermore, the receiver includes additional phase comparison circuitry which corresponds to the language of the claim which recites "means at said receiving point responsive to the carrier components of said waves * * *." The comparison circuitry in the receiver performs phase difference measurements on the carrier and modulation components of signals received by the receiver to determine the receiver position. The prior art pertinent to the '290 patent is listed in finding 7 and shows that hyperbolic position determining systems were known at the time of the invention of the subject matter of the '290 patent. The Shanklin patent [1] discloses a position indicating system in which receiver position is determined by measuring the phase relation of modulation components of radio signals. The German Harms patent [2] discloses an unmodulated system wherein the receiver is responsive to carrier frequencies. In addition, the Shanklin patent indicates that a more accurate position determination may be obtained by impressing modulation frequencies which are multiples of the first modulation frequency on the carrier waves. Shanklin demonstrates the concept of coarse and fine position determination in a hyperbolic system but does not indicate that coarse position determination may be derived from the modulation components .and fine position determination from the carrier components.

The prosecution history of the '290 patent shows that patent claim 19 was copied from an issued patent in order to provoke an interference between the '290 patent application and that patent. The Patent Office refused to allow the applicant to copy another claim from the patent which called for "modulation components of different frequencies * * *" because the '290 specification disclosed

1. Shanklin _____ 2,144,203 _____ January 17, 1939

2. Harms _____ German 546,000 _____ March 8, 1932

only one modulation frequency and could not support such a claim. Pursuant to the rejection of the claim by the Patent Office, applicant amended the claim to eliminate the recitation of different modulation frequencies, and the amended claim was then allowed. Although this claim is not relied upon to establish patent infringement, its prosecution history may be considered in determining the scope of the invention sought to be protected by the claims of the patent. Graham v. John Deere Co., *supra*. The prosecution history of the '290 patent indicates that the invention of the '290 patent contemplated a navigation system in which carrier signals were modulated at a single modulation frequency.

### Loran–C Navigation System

Loran-C, the alleged infringing system, is a hyperbolic navigation system in which pulses are radiated from transmitting stations. The pulses are in the form of bursts of 100 kc carrier frequency signals. The transmitting stations are synchronized to radiate pulses at predetermined time intervals so that a mobile receiver responsive to the pulses does not detect any overlap in the received pulses. The receiver of the Loran-C system measures the time difference in arrival of pulses from master and slave stations to provide a coarse indication of the receiver position relative to those stations. The receiver also measures the difference in phase between the carrier signals which form the pulses to provide a more precise determination of the position of the receiver. In order to measure the time difference between the received pulses, the receiver employs circuitry for generating sampling trigger signals which correspond to the received master and slave pulses. The trigger signals are aligned with predetermined sampling points on the master and slave pulses, and the receiver provides a direct indication of the amounts of time by which the trigger signals must be shifted to align the trigger signals with the sampling points on the pulses. The phase difference on the

carrier frequencies is measured by synchronizing a 100 kc oscillator at the receiver with the carrier frequency (100 kc) of the received master pulse. The receiver circuitry then measures the difference in phase between the signal from the reference oscillator and the carrier frequencies of the pulses received from the slave transmitters. The receiver provides a direct indication of this phase difference. The 100 kc reference oscillator is required because the Loran-C transmitting stations are synchronized so that no overlap in the transmitted pulses is detected by the receiver.

A comparison of Loran-C and the system of the '290 patent shows that both systems are concerned with hyperbolic navigation arrangements in which coarse position determination is derived from the modulation components of transmitted radio signals and fine position determination is derived from the carrier components of the signals. In Loran-C the carrier components have a frequency of 100 kc and the modulation components consist of the pulse repetition rate impressed on the 100 kc carriers. In the system of the '290 patent, the carrier components are 60 kc, 80kc, and 90kc, and the 2,400 cps signals impressed on the carriers are the modulation components. A difference between the systems is that the system of the '290 patent employs modulation components in the form of continuous waves while Loran-C employs modulation components in the form of pulses. This difference accounts for a difference in the operating ranges of the two systems. The system of the '290 patent has an operating range of 100 to 150 miles, while Loran-C is capable of operating over a range of 500 to 1,200 miles. Because the '290 system radiates continuous wave signals, the signals radiated from the transmitting stations cannot be distinguished from the signals reflected from the ionosphere (sky waves) by a mobile receiver located at a distance from the transmitting stations. The effect of sky waves on the operation of

the '290 system severely limits the distance over which the system is operative. The pulse transmission employed in the Loran-C system allows the effect of sky waves on the system to be eliminated. The receiver of Loran–C bases its measurements on the leading edge of each received pulse. Since this portion of the pulse arrives at the receiver before any reflected signals (sky waves), the measurement is free of any sky wave interference. Thus, although the '290 system and Loran-C are concerned with similar objectives, the Loran-C system achieves substantially better results by employing pulse modulation to eliminate the effects of sky waves on the system operation.

### Patent '290 Not Infringed by Loran-C

A detailed comparison of the components of Loran-C and the system of the '290 patent and the operation of the respective components shows that the two systems achieve hyperbolic navigation in substantially different ways. The plaintiff's charge of infringement is not supported in this instance. Although both systems employ modulation components in the determination of mobile receiver position, the pulse modulation of Loran-C is not equivalent to the continuous wave modulation taught by the '290 patent. Pulse modulation in Loran-C allows sky wave interference to be eliminated and requires that the receiver in the system operate in a manner completely different from the receiver operation in the '290 patent. The circuitry in the Loran-C receiver for generating sampling trigger signals and aligning the trigger signals with the received pulses operates on principles entirely different from the operation of the frequency converters and phase comparison circuitry disclosed in the '290 patent. In Loran-C, the fact that the pulses are received at different times requires that trigger circuitry be employed in the receiver to perform the time difference measurement on the pulses. In the system of the '290 patent, phase comparison circuitry is used because the continuous

wave signals are received simultaneously. To make a phase difference measurement on the carrier signals of the pulses, the Loran-C receiver must use a local reference oscillator because the carrier signals do not overlap at any time and phase difference measurement by direct comparison of the carrier signals is impossible. This is not true of the receiver of the '290 patent because the signals are received simultaneously.

Another difference between the two systems is in the manner in which unique identification of receiver position is achieved. In the '290 system, the transmitting stations are arranged so that the slave stations are spaced at equal distances from the master station by distances equal to the wave-length of the modulation frequency impressed on the carrier components. In the Loran-C system no special relationship between station spacing and pulse repetition rate is required.

In view of the differences between Loran-C and the '290 patent, it is concluded that defendant has not infringed claim 19 of the '290 patent by using Loran-C systems or by having equipment manufactured for use in Loran-C systems. The language of claims 15–18 of the '290 patent is substantially similar to that of claim 19, and it is further concluded that defendant has not infringed claims 15–18.

### Patent 2,582,350

Plaintiff contends that defendant has infringed claim 3 of the '350 patent. This patent describes a radio navigation system in which synchronized radio signals of different but related frequencies are radiated from transmitting stations to provide a hyperbolic pattern of position lines along which the transmitted signals are in constant phase relation. The system employs a receiver responsive to the transmitted signals to measure the phase difference between the signals to identify the hyperbolic position on which the receiver is located.

**1018**

Claim 3 of the '350 patent defines a *method* of measuring the phase relation between two synchronized radio waves which is performed by the receiver disclosed in that patent. Patent claim 3 of the '350 patent reads as follows:

 The method of measuring the phase relation between two synchronised radio waves radiated from spaced locations at a point remote from said locations which consists in

(a) separately receiving each of said waves,

(b) amplifying each of said received waves to provide two radio frequency signals,

(c) adding said signals to provide one alternating potential of radio frequency,

(d) subtracting one of said signals from the other to provide a second alternating potential of radio frequency,

(e) separately rectifying said alternating potentials to provide corresponding direct potentials, and

(f) comparing said direct potentials,

whereby a measurement of said phase relation is obtained.

The transmitting stations of the '350 patent radiate synchronized radio waves having different frequencies. The receiver is provided with channels for separately receiving the radio waves. The receiver channels include amplifying circuits for converting the received radio waves to signals of the same radio frequency. A phase comparison is performed on the derived signals by applying the sum of the signals to a first rectifier, by applying the difference between the signals to a second rectifier, and by comparing the rectified potentials provided by the rectifiers to obtain a measurement of the phase relation of the signals.

The defenses asserted by the defendant with respect to the '350 patent are that patent claim 3 is invalid under Title 35 U.S.C. § 102(b), invalid under § 103, invalid because it recites the inherent operation of the apparatus disclosed in the patent, and that patent claim 3 has not been infringed. It is concluded that patent claim 3 of '350 is invalid under § 103, and that no conclusions need be made with respect to the other defenses raised by defendant.

### Patent Claim 3 of '350 Invalid

In support of its defense that claim 3 is invalid, defendant has cited the patents to Affel[3] and Harms. The Affel patent discloses a position indicating system in which synchronized radio signals are radiated from spaced transmitting locations. The signals are synchronized by the common source of radio frequency energy used for the transmitting locations. The receiver disclosed in the Affel patent employs a pair of directional antennas for separately receiving the radio signals. The received signals are applied to amplifying devices which provide signals of constant amplitude. The signals from the amplifying devices are applied to the phase comparison circuitry of the receiver. The phase comparison circuitry disclosed in the Affel patent operates on the same principles of phase comparison set forth in the '350 patent. The arrangement of circuitry is such that the constant amplitude signals are combined by addition and subtraction, and the resultant sum and difference signals are applied to a balanced modulator which produces a direct current output corresponding to the relative phase of the input signals. The description of the phase comparison circuitry in the Affel patent is not sufficiently detailed to permit a conclusion that its operation is identical to the operation of the '350 patent system. The Affel patent does disclose a method of comparing the phase relation between two synchronized radio signals in which the signals are separately received and amplified to provide radio frequency signals on which a phase comparison is performed.

---

3. Affel _____ 1,562,485 _____ November 24, 1925

Defendant has also cited prior art patents to establish that the portion of claim 3 which describes the phase comparison method, *i. e.*, the steps of the claim beginning with "adding said signals * * *," was known in the art at the time that the invention of the '350 patent was made and, further, that these steps describe the principles of operation of any known phase comparison circuit. The Runge patent[4] discloses a phase comparison circuit in which the vector sum and difference of two signals to be phase compared are applied to rectifiers which provide direct current outputs. The rectifier outputs are compared to indicate the phase relation of the signals. The fact that the Runge patent discloses comparison of the rectifier currents while the '350 patent discloses a comparison of the potentials on the rectifiers is not significant. The Curtis[5] and Purington[6] patents both disclose phase comparison circuits which operate on the same principles as described in the operation of the '350 patent. In addition, both patents describe a comparison of rectifier potentials to obtain an indication of phase relation.

Title 35 U.S.C. § 103 provides that a patent may not be obtained if the subject matter as a whole would have been obvious, at the time the invention was made, to a person having ordinary skill in the art to which said subject matter pertains. The Supreme Court stated in Graham v. John Deere Co., *supra*, that the issue of patent invalidity under § 103 lends itself to several basic factual inquiries including the scope and content of the prior art, differences between the prior art and the claim at issue, and the level of ordinary skill in the pertinent art. The prior art in this case shows that, in the art of radio navigation, it was known at the time the invention was made to measure the phase relation of synchronized radio waves by separately receiving the waves, amplifying the received waves, and performing a phase comparison measurement on the amplified waves. This is disclosed by the Affel patent which also suggests that the phase comparison may be performed by an arrangement similar to that described in the '350 patent. The Runge and Curtis patents disclose phase comparison circuits which operate in substantially the same manner as the method of phase comparison taught in the '350 patent and which circuits are utilized in the art of radio transmission. No evidence, other than the prior art patents and the expert testimony relating to the patents, has been presented to establish the actual level of ordinary skill existing in the art at the time the method of the '350 patent was disclosed.

Claim 3 of the '350 patent is invalid because, at the time of the invention, it would have been obvious to a person having ordinary skill in the radio navigation art to incorporate the phase comparison circuit of the Runge patent in the receiver of the Affel patent to obtain a device which would operate in accordance with the method of claim 3. The Affel patent suggests that a phase comparison circuit in which the signals to be phase compared are combined to produce summation and difference signals may be employed in a receiver in a radio navigation system. It would have been within the exercise of ordinary skill in the art to substitute the phase comparator of the Runge patent for the corresponding circuitry of the Affel receiver. In view of the scope of the prior art, the differences between the prior art and the '350 patent, and the level of ordinary skill in the art as indicated by the prior art, it is concluded that claim 3 of the '350 patent is invalid under § 103 of the patent statute.

In view of invalidity under § 103, it is not necessary to reach a conclusion on the question of whether or not claim 3 is infringed by the Loran-C system. It is

4. Runge _____ 2,028,880 _____ January 28, 1936
5. Curtis _____ 2,231,704 _____ February 11, 1941
6. Purington _____ 2,281,995 _____ May 5, 1942

noted that the evidence presented by the plaintiff with respect to infringement is not sufficient to establish that claim 3 has been infringed. Plaintiff's evidence consisted of expert testimony relating to pages from a Government manual illustrating *circuits* in equipment procured by the Government. The expert testimony pointed out that the illustrated circuits contained elements corresponding to the language of the patent specification. The explanation of the circuits is insufficient to prove that circuit operation is substantially the same as the method set forth in claim 3 of the '350 patent.

### *Patent 2,578,980*

■ Plaintiff contends that defendant has infringed claims 1, 2, 3, 6, and 7 of the '980 patent in using its Loran-C navigation system and in procuring the manufacture of equipment for use in that system. The system of the '980 patent is a hyperbolic navigation system in which receiver position is determined by measuring the time difference in arrival of synchronized pulses originating at fixed transmitting stations. The transmitting stations operate on a common carrier frequency of 100 kc. Pulse modulation at identical repetition rates is impressed on the carrier frequencies. The duration of the pulses are uniform. An important aspect of the '980 system is synchronization. The pulses and the carrier frequencies of the transmitting stations are maintained in fixed time relationships. In order to accomplish synchronization, one of the fixed stations is operated as a master station and the remaining stations are operated as slaves. The slave stations are provided with devices for receiving the pulses transmitted from the master station. The receiving devices are connected to slave oscillators and said oscillators operate in synchronism with the carrier components of the received master pulses. The signals produced by the oscillators are pulse modulated at a fixed repetition rate and a predetermined time delay is inserted

into the pulse modulation. The resulting pulses are applied to transmitting antennas at the slave stations. To maintain the slave oscillator output signals in synchronism with the slave antenna output signals, the transmitting equipment of each slave station is provided with phase regulating circuitry for controlling the phase of the carrier components of the slave pulses. This circuitry includes a phase discriminator, which performs a phase comparison, and a phase regulator operated by the phase discriminator. The phase discriminator measures the difference in phase between the carrier components of the slave pulses and the signal derived from the slave oscillator. Since the oscillator operates in synchronism with the carrier components of the master pulses, the phase discriminator, in effect, measures the phase difference in the carrier components of the master and slave pulses. The phase regulator adjusts the phase of the carrier components of the slave pulses in response to the phase measurement made by the discriminator to maintain the slave oscillator and slave antenna carrier components in a fixed phase relation.

In the system disclosed in the '980 patent, the mobile receiver includes a cathode ray oscilloscope which displays the master and slave pulses on a spiral trace. The time difference in arrival of the pulses at the receiver is determined by measuring the distance along the spiral trace which separates the master and slave pulses.

Patent claim 1 of the '980 patent defines a radio frequency navigation system and reads as follows:

■ In a radio frequency navigation system, the combination of:

(a) a master and a slave transmitting station spaced from each other;

(b) transmitting means at each of said stations for radiating therefrom carrier waves of like frequency pulse modulated at identical pulse recurrence rates and like pulse durations;

(c) receiving means at said slave station for receiving the radiations from said master station;

(d) a phase discriminator at said slave station coupled to the transmitting means thereat and to said receiving means responsive to the phase relation between the carrier waves radiated from said master and said slave stations;

(e) and a phase regulator coupled to the transmitting means at said slave station and actuated by said phase discriminator for maintaining fixed the phase relation of said carrier waves.

Patent claim 2 of the '980 patent differs from claim 1 by adding:

[f] and means for delaying the radiation of each pulse from said slave station a fractional part of said pulse separation period.

Patent claim 3 of the '980 patent differs from claim 1 by adding:

[f] and a mobile receiving apparatus including means for receiving the radiations from said stations,

[g] and time measuring means actuated by said receiving means for measuring the difference in time between the reception of pulses from each of said stations.

*Patent Claims 1, 2 and 3 of '980 Invalid*

Defendant contends that claims 1, 2, and 3 of the '980 patent are invalid under Title 35 U.S.C. § 102 or § 103. In support of its contentions, defendant relies on prior art patents and a report disclosing a navigation system known as LF Loran which was developed subsequent to the Loran-A system. It is concluded that the invention set forth in patent claims 1, 2, and 3 is obvious in view of the prior art.

We must note initially that claims 1, 2, and 3 of the '980 patent are so broad, by themselves, as to encompass *any* device accomplishing the general operation they describe. In fact, the claims would read precisely on an apparatus consisting of an LF Loran, with its master and

slave stations, transmitting pulse-modulated signals, coupled to the British O'Brien patent, employing a phase discriminator-phase regulator. Since these are clearly "old", and plaintiff insists it has produced something novel, it is evident that a more detailed description is necessary to enable a reader to distinguish the '980 from other devices which might be covered by the '980 claims if they are read broadly and literally.

To prevent such invalidity of the patent for overbreadth and clear anticipation (35 U.S.C. § 112 (1964); Hailes v. Van Wormer, 20 Wall. 353, 372, 22 L.Ed. 241 (1873); *see also* Graver Tank & Mfg. Co. v. Linde Air Products Co., 336 U.S. 271, 276–277, 69 S.Ct. 535, 93 L.Ed. 672 (1949); Special Equipment Co. v. Coe, 324 U.S. 370, 385–386, 65 S.Ct. 741, 89 L.Ed. 1006 (1945) (dissent); General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 368–372, 58 S.Ct. 899, 82 L.Ed. 1402 (1938) ), the specifications must in this instance be read to limit the claims. Hailes v. Van Wormer, 20 Wall. 353, 372, 22 L.Ed. 241 (1873); Dominion Magnesium Ltd. v. United States, 320 F.2d 388, 394, 162 Ct.Cl. 240, 249–250 (1963). The painstaking detail of plaintiff's description indicates that the specifications reveal, not a mere example of his invention, but rather the precise nature of the claimed discovery. Thus, plaintiff's claim must be limited to what appears in the description. Hailes v. Van Wormer, *supra,* 20 Wall. at 372, 22 L.Ed. 241. That is the way the patent is summarized *supra* under the heading "Patent 2,578,980".

Plaintiff has admitted in its briefs to the court, as it must, that the "sucked-in oscillator" principle and the phase discriminator-phase regulator described in the patent—the two principal components of the invention—are both old. [P's Reply Brief at 11–12]. Its argument for validity rests upon the novelty (*see, e.g.,* Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 150, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Expanded Metal Co. v. Bradford, 214 U.S. 366, 381, 29 S.Ct.

652, 53 L.Ed. 1034 (1909); Brinkerhoff v. Aloe, 146 U.S. 515, 516, 13 S.Ct. 221, 36 L.Ed. 1068 (1892); Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L.Ed. 241 (1873) ) and unobviousness (35 U.S.C. § 103 (1964)) of the combination of these two devices in a system using both pulses and continuous waves:

> [The '980] is a combined system in which both portions cooperatively and in sequence handle both pulses and CW [continuous waves], and as such it provides a pulse-CW synchronization combination which was not previously employed. [P's Reply Br. 12]

Plaintiff's alleged new, useful and unobvious contribution flowing from the aggregation of these old elements is the instrument's adaptability to a combined pulse-cw system.

To achieve this combined pulse-cw synchronization, the specifications disclose two "separate" stages, one employing pulse signals and the other pulse signals converted to a continuous wave and back again through the use of a modulator. Summarily stated, the '980 device transmits pulse-type signals from the master to the slave station. These signals are received at the slave station and sent through an oscillator which is locked in or "sucked in" to the master oscillator, thereby maintaining an identical phase and frequency relationship between the two. The slave oscillator puts out a continuous sine wave, which is kept in phase by the phase discriminator phase-regulator with the carrier wave (also a continuous wave) upon which ride the pulse-modulated waves, constituting the slave antenna output. The phase-regulated continuous waves are then converted to pulse-modulated signals by means of a modulator, and transmitted from the slave antenna to the mobile receiving unit. Accepting *arguendo* that plaintiff has effected a new application of these two principles ("sucked-in" oscillator and phase-discriminator phase-regulator) through the '980 combination, the question remains,

was the combination obvious in light of the prior art?

Considering the question of patent validity raised by the defendant under § 103 of the patent statute, the starting point is the inquiry prescribed by the Supreme Court in Graham v. John Deere Co., *supra*. The prior art in this instance consists mainly of the Runge patent, the British O'Brien patent,[7] and the LF Loran system. The Runge patent discloses an arrangement in which carrier signals radiated from separate master and slave transmitters are synchronized. Synchronization is automatically accomplished by a phase comparison device at a slave station which controls the phase of the signals radiated from the slave transmitter. The phase comparison device measures the difference in phase between the carrier signals of the slave transmitter and the carrier signals of the master transmitter. The signals from the master transmitter are applied to the phase comparison device by a cable extending between the master and slave stations. The arrangement of the Runge patent is limited to synchronization of continuous waves, and does not itself disclose any arrangement for synchronizing the carrier components of pulses transmitted from separate stations. The LF Loran employs manual synchronization between master and slave-station pulse-modulated signals through the use of an operator who observes the master and slave carrier signals on an oscilloscope and adjusts the slave oscillator until the master and slave signals appear in synchronism on the oscilloscope. The British O'Brien patent discloses a phase controlling circuit which contains a phase discriminator and a phase regulator controlled by the discriminator. It is specified in the British patent that the circuit may be employed in the radio transmitters of a navigation system in order to maintain the transmitters in a controlled phase relation. The circuit functions to maintain a fixed phase relation between the current flowing in a transmitting

---

7. O'Brien _____ British 579,170 _____ April 13, 1942

antenna and the voltage applied to the antenna. There is no suggestion in the British patent of the manner in which the phase controlling circuit might be incorporated into a pulse transmitting system to hold the carrier components of pulses radiated from separate transmitting stations in a fixed phase relation.

Defendant contends that the circuitry of the '980 patent for providing synchronization of the master and slave carrier signals would have been obvious to a person having ordinary skill in this art. The use of master and slave stations is undoubtedly old. The idea of synchronizing the slave signal to the master is also concededly old. In the '980, this synchronization occurs, as already indicated, through two steps. The "sucked-in" oscillator in the slave receiver helps to synchronize the master pulses to the slave pulses, and the phase-discriminator phase-regulator operates on the slave signals at two different points to keep constant the phase between the signals at those points. Plaintiff does not deny that the idea of using a "sucked-in" oscillator for synchronization is old. As for the phase-discriminator phase-regulator, the British patent discloses a phase controlling circuit which maintains the output of a transmitting antenna in a fixed phase relation with respect to the input applied to that antenna. The circuit includes a phase discriminator and phase regulator combination which operates to maintain the signals appearing at separate points in the transmitting equipment in synchronism. Defendant asserts that this is precisely the function of the phase discriminator-phase regulator in the '980 patent.[8] Indeed, Mr. O'Brien himself has so testified [Record, at 249–52] and plaintiff so admits. On the basis of this analysis, defendant concludes that the solution to the problem of carrier synchronization presented in the '980 patent would have

been obvious to a person of ordinary skill in the art within the meaning of § 103. We agree. While the British O'Brien patent (which deals only with continuous wave transmission) is not concerned with synchronizing carrier components of *pulses* radiated from separate transmitting stations, and does not suggest any manner in which a pulse controlling circuit might be employed to accomplish synchronism in that situation, other prior art supplies a man of ordinary skill in the art with the automatic "sucked-in" oscillator principle which can be so employed. This is precisely what Mr. O'Brien did to create the '980, with a modulator to convert pulses to continuous waves, and vice versa, so that the phase-discriminator phase-regulator, as taken from the British patent, can operate in the context of a pulse system.

Judge Rich of the United States Court of Customs and Patent Appeals has set forth a colorful and useful guideline to be employed in Section 103 cases (Application of Winslow, 365 F.2d 1017, 1020, 53 CCPA 1574 (1966)):

> We think the proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references—*which he is presumed to know*—hanging on the walls around him * * * (emphasis added)
>
> * * * Section 103 requires us to presume full knowledge by the inventor of the *prior* art in the field of his endeavor.

In applying this standard to the case before us we see the following situation: A man of ordinary skill in the art of hyperbolic radio navigational systems is sitting at his desk, asking himself how he might construct a device employing the advantages of a pulse and also a continuous wave system, in combination, to achieve a better and more accurate ra-

---

8. It is important to note that the '980 phase discriminator-phase regulator operates solely upon continuous waves and not upon pulses—exactly as does the phase discriminator-phase regulator in the British patent.

dio-navigational system.[9] Looking on his wall, containing all prior art in the field, he sees the pulse-system LF Loran, sending pulse-modulated signals from a master and slave station, the Runge patent, and the other prior art with a "sucked-in" oscillator used to maintain a fixed-phase relationship between master and slave stations. Next, there hangs Mr. O'Brien's British patent teaching observers the method of maintaining in phase carrier waves within the transmitting station (including a slave transmitter). The would-be inventor also knows, of course, of modulators which can turn pulses into continuous waves and back again. Considering the principles of each, we think that the man of ordinary skill in this area would certainly not find unobvious the idea of combining them, using a simple modulator to convert pulses into carrier waves and vice versa.

The general idea of pulse synchronization, the use of master and slave stations for pulse transmittals, the use of the oscillator to lock the master signal to that of the slave, would all be borrowed from the known art. The phase discriminator-phase regulator of the British patent would clearly show how synchronization would be increased if the pulses were transformed into continuous waves for a time. See notes 8–9, *supra*. An individual desiring thus to combine pulses with continuous waves, so as to strengthen synchronization, would certainly realize that the accepted and well-known way to convert a pulse into waves and waves into pulses would be through a modulator. That is what the '980 does. It takes the known devices of a "sucked-in" or locked in oscillator and

a discriminator-regulator to perform the same functions as they performed in the prior art, and uses a modulator to transform the pulses into waves and vice versa, so that the phase-discriminator phase-regulator can operate. No component is new, and the whole combination, though it may have been new, was nevertheless obvious to one skilled in the art. See, for a comparable example in the mechanical field, Ellicott Machine Corp. v. United States, 405 F.2d 1385, 1391, 186 Ct.Cl. 655, 667 (1969). *See, also,* Anderson's-Black Rock, Inc. v. Pavement Salvage Co., 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 decided Dec. 8, 1969.[10]

### Patent Claims 6 and 7 of '980 Not Infringed

Patent claim 6 of '980 recites a radio frequency navigation system including a first stable crystal oscillator and a frequency dividing phase shaping ciruit at the master transmitter station and a second stable crystal oscillator and phase shaping ciruit at the slave transmitter station and need not be reproduced here in full text. Patent claim 7 of '980 recites a radio navigation aid in which the number of carrier wave cycles in each pulse is less than 100 and in which the time spacing between pulses is at least 3 times the duration of each pulse and also is not reproduced here in its full text.

In response to plaintiff's charge that claim 6 of the '980 patent has been infringed, defendant urges that claim 6 is invalid under Title 35 U.S.C. § 103 in view of the prior LF Loran system and that it is also invalid under § 102 in

---

9. The use of continuous waves allows (through the phase discriminator-phase regulator) the correction of phase shift in the slave signal as it proceeds from the slave oscillator to the slave antenna— thereby helping to maintain the synchronization of master and slave signals.

10. We do not consider the contention (which plaintiff made before the trial

commissioner) that the inventor of the '980 patent is entitled to an invention date prior to the filing date of the patent application since plaintiff did not renew that argument before the judges.

Also, in view of our holding of invalidity, it is unnecessary to consider whether defendant has infringed claims 1, 2, or 3 of the '980 patent.

view of the prior Snow patent.[11] It is concluded that claim 6 of the '980 patent is not infringed by the Loran-C navigation system. In view of this conclusion, the contentions of the defendant with respect to invalidity need not be considered.

In determining the issue of patent infringement, the first step is to consider the specific language of the patent claim. Dvorsky v. United States, 352 F.2d 373, 173 Ct.Cl. 638 (1965). The state of the prior art and the prosecution history should also be considered in interpreting that language. Graham v. John Deere Co., *supra.*

Patent claim 6 of '980 relates to the synchronization of master and slave transmitting stations in a radio navigation system. This claim recites the two aspects of the synchronization employed in the '980 patent, *i.e.,* synchronization of the carrier signals radiated from the transmitting stations and synchronization of the pulse modulation impressed on the carrier signals. At the master transmitting station, a first crystal oscillator serves as the source of the master carrier signal and a frequency dividing circuit coupled to the oscillator provides the pulse modulation which is impressed on that signal. A second crystal oscillator at the slave transmitting station is the source of the slave carrier signal. A receiving device at the slave station responds to the carrier signal transmitted from the master station. The receiving device is coupled to the second oscillator and functions to maintain the second oscillator in synchronism with the first oscillator. In this arrangement, the second oscillator is "sucked in" and operates in a fixed phase relationship with the first oscillator. The slave station also includes a frequency dividing circuit which is coupled to the second oscillator and provides the pulse modulation for the slave carrier signal. The pulses impressed on the slave carrier signal are identical to the master pulses except for a time delay in-troduced by the frequency dividing circuit of the slave station. The master and slave transmitting stations radiate synchronized pulses having synchronized carrier signals.

The defendant's Loran-C navigation system is a pulse transmission system in which synchronized pulses are radiated from master and slave transmitting stations. It is a characteristic of the pulses that the master and slave carrier frequencies forming the pulses are also synchronized. The oscillator of the slave station is not sucked in to the operation of the master oscillator. In the slave transmitting equipment of the Loran-C system, the signal from the slave oscillator is applied to an adjustable phase shifter and then to a phase difference detector. The detector is also connected to an antenna which receives the transmitted master signals. It determined the phase difference between the master carrier signal and the signal from the phase shifter and provides an output to adjust the phase shifter in order to bring the compared signals into synchronism. In determining whether defendant's Loran-C system infringes patent claims 6 and 7, it is also necessary to compare the structure, operation, and result accomplished by the system and the patented invention. Eastern Rotorcraft Corp. v. United States, 384 F.2d 429, 181 Ct.Cl. 299 (1967); Texsteam Corp. v. Blanchard, 352 F.2d 983, (5th Cir. 1965), cert. denied 387 U.S. 936, 87 S.Ct. 2064, 18 L.Ed.2d 1000 (1967). The ordinary test of patent infringement is whether the patented and accused systems operate in substantially the same way to accomplish the same result. Nickerson v. Bearfoot Sole Co., 311 F.2d 858, 859 (6th Cir. 1962), as amended January 10, 1963, cert. denied, 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed.2d 50 (1963). A comparison between Loran-C and the system of the '980 patent reveals a significant difference in the respective arrangements for accomplishing synchronization of the carrier signals.

11. Snow _____ 2,067,353 _____ January 12, 1967

In the '980 patent a receiver responsive to the master carrier signal is directly connected to the slave oscillator to synchronize the slave carrier signal from the oscillator with the received master carrier signal. In Loran-C there is no direct connection of the receiver to the slave oscillator. An adjustable phase shifter is interposed between the oscillator and a phase detector which performs a phase comparison on signals derived from the phase shifter and from a receiver responsive to the master carrier signal and adjusts the phase shifter until synchronism is achieved. Defendant's Loran-C does not include a receiving device which operates in accordance with the language of claim 6 of the '980 patent. In Loran-C, the receiving device is not coupled to the slave oscillator and does not operate to synchronize the slave oscillator with the master oscillator. The arrangement of the Loran-C system is not equivalent to the invention of the '980 patent because the operations of the two systems in synchronizing the carrier signals are substantially different. Claim 6 of the '980 patent has not been infringed.

Patent claim 7 of '980 specifically calls for the radiation of pulse modulated carrier waves having the characteristics that each pulse contains less than 100 carrier wave cycles and that the time spacing between pulses is at least three times the duration of each pulse and an exact full number multiple of the duration of one carrier wave cycle. The evidence does not establish that the defendant's Loran-C system operates in a manner which corresponds to the operation defined in patent claim 7. There is no showing that Loran-C performs the same function in substantially the same way to accomplish substantially the same result as the patented invention. The explanation of the operation of the Loran-C system presented by plaintiff's expert testimony is insufficient to support a conclusion that the signals transmitted by the Loran-C stations have the characteristics expressed in claim 7 of the '980 patent. Patent claim 7 of '980 has not been infringed.

Defendant has also contended that the '980 patent discloses a system which has never been commercially manufactured or exploited and hence must be a *paper patent* which must be strictly and narrowly construed. In a close case, the fact that a paper patent is involved might be persuasive in finding that a patent claim is not infringed. Lack of present commercial success by a patent owner himself does not preclude enforcement of his right to exclude others. The record established no intention by the plaintiff not to use its inventions. However, since we have decided the question of infringement adversely to the plaintiff, we need not decide defendant's contention with respect to paper patents.

### Patent 2,568,250

The '250 patent discloses a phase comparison circuit which provides a direct potential representative of the phase angle between two input signals applied to the circuit. The circuit includes a pair of rectifiers and a pair of equal resistances connected in series to rectifier terminals of opposite polarity. The input signals are applied to transformers, one of which has a secondary winding grounded at its midpoint, in order to supply the vector sum of the input signals to one of the rectifiers and the vector difference of the signals to the other rectifier. The output signal at the midpoint of the resistances is proportional to the cosine of the phase angle between the input signals. Plaintiff relied upon claim 1 of the '250 patent. This patent claim reads as follows:

In a phase discriminator circuit for producing a direct control potential the magnitude of which is a function of the phase angle between a first and a second input signal of a given radio frequency, the combination of:

(a) means for producing from one of said signals a third signal of

said given frequency and bearing a fixed phase opposition relation to said second signal;

(b) a pair of rectifiers;

(c) circuit means for applying to one of said rectifiers the vector sum of said first and second signals;

(d) circuit means for applying to the other of said rectifiers the vector sum of said first and third signals;

(e) and a pair of equal series connected resistances connected between said rectifiers, said resistances being connected to rectifier terminals of opposite polarity.

whereby the direct potential of the midpoint between said resistances is proportional to the cosine of the phase angle between said first and second input signals.

Defendant asserts that patent claim 1 of '250 is invalid under § 102(b) of Title 35 U.S.C. in view of the Purington patent and further asserts that this claim is invalid under § 102(e) in view of the Bell patent.[12] It is concluded that claim 1 of the '250 patent is invalid under § 102(b); hence, defendant's contentions with respect to the question of validity under § 102(e) are not decided. It is also concluded that the evidence has not established that claim 1 is infringed by the defendant's Loran-C system.

In order that a reference anticipate an invention defined in a patent claim under § 102(b), the reference must disclose all the elements of the claimed combination, or their equivalents, functioning in substantially the same way to produce substantially the same results. Palmer v. United States, 182 Ct.Cl. 896, 900 (1968); Straussler v. United States, 339 F.2d 670, 168 Ct. Cl. 852 (1964). Where the Patent Of-

fice considered the reference during the prosecution of the patent claim, there is a presumption that the claim is valid over the disclosure of that reference. The presumption of validity is a rebuttable presumption. Upon a clear showing that the reference considered by the Patent Office completely anticipates the patent claim and that the distinctions argued by the applicant are not valid distinctions, the presumption is deemed to be rebutted. Palmer v. United States, *supra*. The principles of the *Palmer* case are applicable to the question of patent validity with respect to claim 1 of the '250 patent. Defendant urges that this claim is anticipated, under § 102(b), by the Purington patent, a reference which was considered by the Patent Office during the prosecution of the patent claim. In urging the patentability of claim 1 over the Purington patent, the patent applicant argued that the reference did not suggest using a pair of equal resistances connected in series between rectifier terminals of opposite polarity. The applicant urged that no equivalent circuit was found in the Purington patent, and the Patent Office thereafter allowed the patent claim. A study of the Purington patent reveals that the disclosed phase comparison circuit includes an arrangement which is *equivalent* to the series connected resistances of patent claim 1. The Purington patent discloses a resistance connected through transformer windings to rectifier terminals of opposite polarity. The center point of the resistance provides a direct potential which indicates the difference in phase between input signals applied to the comparison circuit. The transformer windings of the circuit are arranged to apply the vector sum and the vector difference of the input signals to the rectifiers of the comparison circuit. The transformer windings disclosed in the Purington patent perform the same function as the transformers shown in the '250 patent and operate in

12. Bell _____ 2,603,748 _____ July 15, 1952

substantially the same way to accomplish substantially the same result. It is concluded, under the principles of the *Palmer* case, *supra,* that the invention defined in claim 1 of the '250 patent is fully anticipated by the disclosure of the prior Purington patent and that claim 1 is invalid under § 102(b) of the patent statute. In view of this conclusion, no conclusion is made concerning the question of patent validity under § 102(e) of the statute.

Since claim 1 of the '250 patent is invalid, no conclusion is reached with respect to the issue of patent infringement of that claim. It is noted that plaintiff's evidence is not sufficient to establish that claim 1, if valid, has been infringed by the Loran-C system. Although Loran-C contains components corresponding to the elements set forth in the patent claim, it is not established that the Loran-C components perform the same function as the patented combination in substantially the same way to accomplish substantially the same result.

*Summary*

In summary, the following conclusions are made with respect to the issues of patent validity and infringement raised in this case:

(1) Claims 15–19, inclusive, of the '290 patent have not been infringed;

(2) Claim 3 of the '350 patent is invalid under Title 35 U.S.C. § 103;

(3) Claims 1, 2, and 3 of the '980 patent are invalid under Title 35 U.S.C. § 103;

(4) Claims 6 and 7 of the '980 patent have not been infringed;

(5) Claim 1 of the '250 patent is invalid under Title 35 U.S.C. § 102(b).

Plaintiff is not entitled to recover anything.