Donald W. NORWOOD, an individual, Plaintiff,

v.

EHRENREICH PHOTO–OPTICAL IN-DUSTRIES, INC., a corporation, and Ehrenreich Photo-Optical Industries West, Inc., a corporation, Defendants.

No. 69–1028.

United States District Court, C. D. California.

Nov. 23, 1970.

uating brightness in a scene to be photographed. It was designed to control camera exposure. Plaintiff contends that he has had prototypes of the invention constructed and tested but that he has been unable to commercially market the product. He asserts that Claims 1 through 4, 6, 7 and 9 are infringed by the defendants.

The defendants are sales outlets for Nippon Kōgaku U.S.A. which in turn imports the cameras in issue from the manufacturer Nippon Kogaku K.K., a Japanese manufacturer. Plaintiff asserts that the following cameras made by Nippon Kogaku K.K. and sold by the defendants in the United States infringed the patent in suit:

(1) The Nikon F Photomic TN Camera.

(2) The Nikkormat FTN Camera, and

(3) The Nikon Photomic FTN Camera.

The defendants contend that the claims being pressed in plaintiff's patent are invalid; that defendants have not infringed; and that the plaintiff cannot maintain the charge of infringement against the defendants under the doctrine of filewrapper estoppel.

Mr. Norwood has for many years done research in the science of light measurement for photographic exposure control and has authored many technical papers on the subject. He claims to have developed what has become known as the "Norwood Binary", a center-weighted system for the measurement of the light reflected from a photographic scene. This system recognizes two areas of a photographic scene, the central area and the background. Greater photographic excellence comes from proportioning the light in the center of the scene in such manner as will give it greater pictorial importance over the background. Plaintiff developed two devices to provide the center-weighted system of exposure control. The first involved a dual arrangement of objectives and related photocells which functioned independently of each other. This structure was patented by

Lyon & Lyon, by R. Douglas Lyon, Los Angeles, Cal., Christie, Parker & Hale, Andrew J. Belansky, Pasadena, Cal., for plaintiff.

Gibson, Dunn & Crutcher, Los Angeles, Cal., Ward, McElhannon, Brooks & Fitzpatrick, Joseph M. Fitzpatrick, New York City, Charles B. Cannon, Chicago, Ill., O'Melveny & Myers, Bennett W. Priest, Los Angeles, Cal., for defendants.

## MEMORANDUM OPINION

DAVID W. WILLIAMS, District Judge.

Plaintiff, Donald W. Norwood, is the owner of patent No. 3,304,435 (hereafter "435") issued February 14, 1967 which relates to a photo-metric device for eval-

plaintiff in U. S. Patent No. 3,121,170 issued February 11, 1964. This is not the patent in suit. The second device, which is the subject matter of the patent in suit, uses one objective and one photocell and a cooperating screen or filter.

Claims No. 2 and 7 of the 435 patent are representative of the several claims.

Claim No. 2 reads as follows:

"2. A photometric device comprising a single lens structure for forming a single image of a scene, a single means responsive to the light of said image and operable to vary an electrical signal in accordance with the brightness thereof, said light responsive means including means for introducing a difference in response between different portions of said image so that each lumen coming from a preferential central portion of the scene and forming a corresponding preferential central portion of said image will cause a greater electrical output signal than each lumen coming from the remaining portion of the scene and being in a remaining portion of said same image produced by said same lens structure, and an electrically actuated unit operable by said light responsive means in response to light in each of said portions of said image and to a greater extent by each lumen from said preferential central portion of the scene than by each lumen from said remaining portion thereof."

Claim No. 7 states that:

"7. A photometric device comprising a single means for forming a single image of a scene, a single means responsive to the light of said image and operable to vary an electrical signal in accordance with the brightness thereof, said light responsive means including differential filter means for introducing a difference in response between different portions of said image so that each lumen coming from a preferential central smaller portion of the scene and forming a corresponding preferential central smaller por-

tion of said image will cause a greater electrical output signal than each lumen coming from the remaining larger portion of the scene and being part of a remaining larger portion of said same image produced by said same image forming means, and an electrically actuated unit operable by said light responsive means in response to light in each of said portions of said image and to a greater extent by each lumen from said preferential central smaller portion of the scene than by each lumen from said remaining larger portion thereof, said difference in response being of such value that the average brightness of the preferential central smaller portion of the image will have at least as much influence in determining the magnitude of the electrical output signal as will the average brightness of the remaining larger portion of the image."

Mr. Norwood explains that when a photographer is composing a scene he ordinarily aims his camera so that the center of interest is located near the center of the camera frame. He likens this to the practice of the human eye when it is observing a scene. Thus, there is greater light intensity on the brightness of the center of interest and lesser intensity on the brightness of the remainder of the scene. He claims that his light exposure meter recognizes the average brightness of the center of interest and the average brightness of the remainder of the scene and produces exposure results which are superior.

His earlier patent, No. 3,121,170 employed two photoelectric cells for responding to the light within the two fields. He claims that the patent in suit improves upon this by employing a single conventional cell for response to the entire scene uniformly. He describes his latest invention as rendering possible "the two field weighted response in apparatus which may include only a single photoelectric cell and a single lens structure or other image forming means, rather than two cells and two separate lenses."

Plaintiff contends that his patent teaches center-weighting but the evidence shows that center-weighted light meters, which simultaneously evaluate the light from the center and background portions of the scene to be photographed and give weight or preference to the light from the smaller center portion, are not new. (Rath Patent No. 2,444,674).

Norwood's device consists of a hand-held measuring meter comprised of a single lens and a single photo cell with a filter positioned in front of the cell, the filter being designed to permit relatively more of the light from the center of the scene to pass through to the cell.

Defendant's device is structurally different from the patented meter in that, among other things, it consists of two aspherical lenses, two field stops and two photocells, all functioning to provide a differential response or relative weighting of the light from different areas of the scene. The two photocells are positioned so as to receive light from different and partially overlapping portions of the image formed at the focusing screen. The ultimate different light response measured by the light meter is thus the sum of the light measurements of the two photocells, and the response of the light meter is an indication which is more responsive to the central portion of the scene.

Plaintiff's claims specify a single lens or a "single means" for forming a single image of a scene and a "single means" responsive to the light of said image. He contends that defendant's device infringes because, although it consists of two photocells, they are electrically interconnected to function as a single cell and bring about the result of splitting the light beam and allowing it to rejoin at the photocell.

Convincing evidence from experts put plaintiff's theory in serious dispute. I adopt the view that the accused structure does not infringe because it consists of two photocells which operate with the field stops and the aspherical lenses to provide differential response between the center portion of the scene and the background. This is brought about in part by the overlapping effect of the two cells and proof that both photocells are necessary in the operation of the defendant's system to accomplish differential response between the two light fields. In this respect it differs from the means called for in Claims 2 and 7 of the patent in suit.

Plaintiff claims that representatives of Nippon Kogaku K.K. negotiated with him under the guise of seeking a license under plaintiff's patent, and then having obtained through these negotiations disclosures of technical information relating to the Norwood Binary system, broke off negotiations and introduced the infringing cameras into the United States. The convincing evidence reveals that while some negotiations did in fact take place, no helpful technical information was imparted by plaintiff or his representative to the Japanese company and this accusation must be rejected.

The Nikon camera has a removable head and interchangeable focusing screen. The function of the screen is to define the scene so that a photographer can compose his picture. It offers him an exact duplicate of the scene that he can focus on. All reflex cameras must have a focusing screen. There are various types of screens to suit the eyesight and the preferences of the individual photographer. Some screens have focusing targets such as a split prism. Nikon's early cameras had no light meter built into its viewfinder but it offered such a meter as an accessory which could be coupled to the unit. In 1962 it introduced the Photomic into the United States. This was a slip-on head which consisted of a photoelectric and exposure meter system. Such an attachment permitted the photographer to view through the eyepiece and get his light reading internally. It is thus called a through-the-lens meter. The metering is done with the light coming through the lens that registers a scene on the ground glass. By 1967 the manufacturer incorporated in this finder system a light me-

ter system called Photomic TN. The following year it manufactured and distributed an improved camera called Photomic FTN but it involved no change in the light meter system.

The Nikon Optical System comprises a taking lens which is pointed toward the scene to be photographed. Light from the scene passes through the taking lens and strikes a mirror which is mounted so as to lift up at the instant the operator snaps the picture, allowing light from the scene to pass through the taking lens to the film. The light from the taking lens is transmitted by the mirror to a focusing screen on which an image of the scene is formed. The light from the image formed at the focusing screen is then transmitted through a pentaprism and an eyepiece lens to the eye of the operator. The screen includes a split-image prism to aid in focusing the camera. Light from different portions of the image on the focusing screen is also transmitted through the pentaprism to the two aspherical lenses, each of which forms an image at one of the field stops which are positioned through the lenses and the two photocells. The two photocells are connected to an electrical meter which gives a reading representing the sum of the light measured by each of the cells. Thus the combination of the aspherical lenses, the field stops, and the photocells provide a differential response allowing weighting of the light from the different areas of the scene, called "center-weighting."

Defendants' Nikkormat FTN Camera operates similar to its Nikon F Camera except that it involves a different arrangement of the parts which cause the differential light response from different portions of the scene.

Because the defendants' structures embodied two photocells which cooperate with the field stops and aspherical lenses to provide differential response between the center portion of the scene and the background, said structures do not infringe representative claims 2 and 7 of the 435 patent which specify "a single lens" or so called "single means" for forming a single image of a scene and a single means responsive to the light of said image. It is defendant's contention that its structures embody at least three image forming lenses, namely, (1) the taking lens, and (2) the two aspherical lenses, all of which defendants claim are necessary for the proper operation of its structures.

Plaintiff contends that there is infringement because the "means for introducing a difference in response between different portions of said image" in defendant's structures is defendant's focusing screen. The evidence shows that in defendant's accused structures the difference in response between the center area and the background area of the scene is not produced by the focusing screen but is produced by the cooperative action of the two photocells and the field stops and the two aspherical lenses. Defendant's focusing screen simply serves as a focusing aid to the photographer and this was the function of the screen in defendant's product in cooperation with other parts of its optical system since a time prior to plaintiff's patent.

## PRIOR ART

Section 103 of the Act provides that if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains, the subject matter is unpatentable.

■ The 435 patent must be considered invalid as obvious in view of the prior art to a person having ordinary skill in the art. Ellicot Mach. Corp. v. United States, 1969, 405 F.2d 1385, 186 Ct.Cl. 655; B. F. Goodrich Co. v. Rubber Latex Products Inc., 400 F.2d 401 (C.A.Ohio 1968).

■ To support patentability it is not sufficient that a combination of elements be merely new or even represent a

modest improvement in the arts. Such combinations must also be "non-obvious" to a person having ordinary skill in the art. Continental Can Co. v. Old Dominion Box Co., 393 F.2d 321 (C.A.N.Y. 1968).

The Elwood Densitometer, known to have been marketed as early as 1959, (not considered by the Patent Office during its examination of plaintiff's application for the 435 patent) has the same general arrangement of elements, viz, lens to cooperating screen to photocell as in the 435 patent. The Elwood Densitometer is a spot meter which uses an objective lens, a cooperating screen and a photocell in such manner as compares favorably with those component parts of the defendant's system which plaintiff points to as infringing upon his 435 patent. Defendant has demonstrated that as plaintiff construes his claims 2 and 7 in an effort to make it read upon the defendant's accused systems, it reads likewise upon the prior art Elwood Densitometer.

Defendant has also demonstrated that as plaintiff construes his claims 2 and 7 in an effort to make it read upon defendant's optical system, said claims read to the same effect upon prior art Nelson Patent No. 3,060,823. Nelson claims that he has developed "* * * a light meter having a stationary photocell mounted in front of said reflecting surface and shielded to intercept and measure only the reflected portion of the entire light beam passing through said viewfinder system, whereby a precise measure of the light intensity across the entire beam framed by the camera may be obtained simultaneously with the viewing operation."

The Rath Patent, No. 2,444,674 issued July 6, 1948, describes a "Multiple Light Baffle Brightness Meter for Photoelectric Exposure Determining Devices". This is a prior art center-weighted response system. It is a photoelectric exposure or meter device for use with cameras to obtain a correctly exposed photograph. It uses two photocells arranged in an electrical circuit which includes an indicator over which a pointer is excited in response to the electrical current generated in the circuit by the two photocells. One of the photocells receives light from the entire image of the scene and the other photocell receives light only from the center area of the scene. Their overlapping results in a light exposure indication which gives weight to the central area of the scene as it is related to the background area. Thus, by reason of the Rath Patent it is evident that it was known in the art of photoelectric light meters prior to plaintiff's 435 patent as a means of obtaining center-weighting.

A review of the prior art is persuasive that the patentee did nothing unobvious.

### FILEWRAPPER ESTOPPEL

On February 11, 1964, plaintiff was granted U. S. Patent No. 3,121,170 on a "Light Responsive Unit Having Two Acceptance Angles". Thereafter during the time the application for the present patent No. 3,304,435 was pending in the Patent Office, the Examiner cited plaintiff's earlier patent against the application for the 435 patent stating that

"claims 1, 2, 5, 12 and 13 are rejected, under 35 USC 101 and 154 on the ground of double patenting in view of claims 1 and 2 of Patent No. 3,121,170 issued to applicant on February 11, 1964. The 'means' clauses of the instant claims are considered broad enough to include the plural photocell arrangement claimed in the patent claims."

Plaintiff responded to the Examiner's rejection of those certain claims by filing an amendment in which he cancelled claims 5, 6 and 9 of his pending application and amended the remaining claims. The present claims 2 and 7 of the 435 patent were amended by inserting before the word "means" the words "a single" and by inserting before the word "image" the words "a single". In his response the plaintiff stated "* * * all the remaining claims have been amended to overcome the rejection of

certain of these on the grounds of double patenting in view of the applicant's patent 3,121,170 by reciting (a) the single means for forming an image, (b) the formation of a single image and (c) a single means responsive to the single image for effecting a control whereas the claim of 3,121,170 recites two (2) image forming means, and (2) images, or the like."

Plaintiff's response emphasized to the Examiner that his present invention "renders possible the two field weighted response in apparatus which may include only a single photoelectric cell and a single lens structure or other image forming means, rather than two cells and two separate lenses." The Examiner accepted these words of limitation and reversed his earlier rejection of the claims and caused issuance of the 435 patent.

■ No limitation which a patentee puts into his claim may be ignored, whether or not the limitation was necessary to validate the claim.

Keystone Bridge v. Phoenix Iron Co., 95 U.S. 274, 24 L.Ed. 344.

See also Fay v. Cordesman, 109 U.S. 408, 3 S.Ct. 236, 27 L.Ed. 979.

In the present suit the plaintiff is attempting to sublimate the word limitation which caused him to obtain his 435 patent over the Examiner's earlier rejection of his claims, and to urge that the accused product of the defendants accomplishes its results by the employment of a "single means", notwithstanding its employment of two photocells, two field stops and two aspherical lenses. As stated before, it is the plaintiff's position that defendants' two photocells are interconnected and form a single means for forming a single image of the scene.

Plaintiff cannot recapture in infringement litigation that which he has surrendered in the Patent Office to secure the grant of his 435 patent. Exhibit Supply Co. v. Ace Patents Corporation, 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942).

■ When an applicant has accepted the rejection of a broad claim he may not later assert that another claim, deliberately restricted to secure its allowance, is its equivalent. Black's Law Dictionary, 4th Ed. P. 756,

"It is well-established that the claims of a patent must be read and interpreted in the light of claims which have been rejected. * * * Claims which have been allowed cannot, by construction, be read to cover what has thus been eliminated from the patent." Oregon Saw Chain Corporation v. McCulloch Motors Corp., 323 F.2d 758, 768 (9th Cir. 1963).

In Tampax v. Personal Products, 123 F.2d 722 (2nd Cir. 1941) plaintiff applied for a patent covering an invention which provided for the "convoluting" of a certain device. The Patent Office rejected his application. Plaintiff then filed a new application which provided that the device be compressed into an exact zigzag form rather than being generally convoluted. Defendants apparently manufactured a device which compressed cotton in a convoluted but not zigzag form. The Court held that inasmuch as plaintiff was required to limit his invention to a zigzag form in order to get a patent, he could not now assert that his patent covered all convoluted forms. Plaintiff's action for patent infringement was denied.

In ITS Rubber Co. v. Essex Rubber Co., 272 U.S. 429, 443, 47 S.Ct. 136, 141, 71 L.Ed. 335 (1926), the Court stated, "it is well-settled that where an applicant for a patent to cover a new combination is compelled by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element, he cannot after the issue of the patent broaden his claim by dropping the element which he was compelled to include in order to secure his patent. * * * The patentee is thereafter estopped to claim the benefit of his rejected claim or such a construction of his amended claim as would be equivalent thereto."

■ It must be held that plaintiff is barred by the doctrine of filewrapper es-

toppel from successfully urging that the claims of his 435 patent have been infringed by the defendant's accused structures.

The fact that the 435 patent is a "paper patent", having never been produced other than by prototype, or offered for sale, dictates that it must be strictly construed both as to the alleged infringement and the asserted validity thereof. Lockwood v. Langendorf United Bakeries, Inc., 324 F.2d 82 (9th Cir. 1963).

I find that plaintiff's 435 patent is invalid and was not infringed by defendants.

Defendants will prepare Findings of Fact and Conclusions of Law and a form of Judgment in accord with this opinion within 15 days of receipt of this Memorandum.